## WASHINGTON COUNTY *v.* SALLINGER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NORTH CAROLINA.

Argued November 10, 1886. — Decided November 29, 1886.

A court-house in North Carolina being destroyed by fire, the county commissioners rented a building on another site, about 200 yards distant from the old site, to be used as a court-house; and after five years' occupancy purchased the building and paid for the same by issuing bonds of the county to the seller. In an action on the bonds against the county; *Held*, that the Act of the Legislature, of North Carolina of 1868, c. 20, relating to the removal of county buildings, does not apply to such a case. The provisions contained in the proviso in § 5 of the Act of the Legislature of North Carolina, of February 27, 1877, to establish county governments, apply only to commissioners to be chosen thereafter under the provisions of that act.

This was an action at law to recover upon bonds issued by the commissioners of Washington County, North Carolina, for the purchase of a court-house. The case is stated in the opinion of the court.

*Mr. C. M. Busbee* for plaintiff in error.

*Mr. Samuel F. Phillips* for defendant in error.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The object of this writ of error is to reverse a judgment rendered against the plaintiff in error on five obligations in writing, for $1000 each, of like tenor, as follows, to wit:

"OFFICE OF THE BOARD OF COMMISSIONERS
"No. 19.          OF THE COUNTY OF WASHINGTON, N. C.
"Twelve months after date, with interest from date at the rate of six per centum per annum, the Board of Commissioners of Washington County promise to pay to Louis M. Hornthal, or to his order, one thousand dollars, for value received, and to secure indebtedness contracted for the necessary expenses of said county in the purchase of brick building for court-house.
"This first day of October, 1877.
                          "J. G. AUSBON,   [SEAL.]
          "*Chairman of the Board of Commissioners*
                    *of Washington County.*
"Countersigned:
     "W. H. STUBBS,
       "*Register of Deeds and Clerk of said Board.*"

The plaintiff below was a purchaser for value before due, and without notice of any defence. His right to recover was denied on the ground that, under the circumstances, the Board of Commissioners of Washington County had no authority of law for making and issuing the obligations sued on.

It appears from the bill of exceptions that the court-house of Washington County was destroyed by fire in the spring of

1872; that in the following August the defendants, the County Commissioners, rented, the building for the purchase of which the bonds sued on were afterwards issued, which is situated about 200 yards from the court-house which was destroyed by fire, in the town of Plymouth, and, before the succeeding fall term of the Superior Court, gave notice, by public advertisement for thirty days, declaring the house so rented to be the public court-house of Washington County, and that courts were held continuously therein until the commencement of the action.

The defendant offered in evidence a copy of the proceedings, as recorded, of a special meeting of the Board of County Commissioners of Washington County, held on the first Monday in October, 1877, at which the whole number of five were present. The transcript of the proceedings of that meeting sets out a paper addressed to the Board of Commissioners of Washington County, signed by eight justices of the peace, requesting that body, at its next meeting, to contract "for the purchase of the brick store and lot in Plymouth, lately the custom-house, for the use of the county of Washington for a court-house, paying for the same the bonds of the county, bearing six per cent. interest, payable at one, two, three, four and five years, with interest from date, at price of five thousand dollars, or five bonds of one thousand dollars each, at the rate of interest due as aforesaid, as we have here reconsidered.

"Plymouth, N. C., September 24th, 1877."

It was thereupon moved and seconded that a vote of the board be taken on the purchase of the brick building then used as a court-house. Whereupon three votes were cast for said purchase and one vote against it. The record of the proceedings of the meeting then contains the following:

"Whereas the court-house of the county of Washington, with the offices for the preservation of the public records and for the transaction of the public business, were destroyed by fire in the month of May, 1872, and it is absolutely necessary that the county shall own a court-house, with suitable offices wherein the public records may be safely kept, and wherein the officers of the court and the county can conveniently transact

the public business, and this board declare that it is inexpedient longer to occupy a rented house for these purposes; and whereas Louis M. Hornthal, of the city of New York, has offered to sell to this Board of Commissioners for said county the water part of lot numbered one hundred and forty nine, situated in the town of Plymouth in said county, so numbered upon the plat or plan of said town, known as the custom-house property, fronting fifty feet upon Water street and extending to the river, including the wharf upon the same, with the brick house forty feet wide, sixty feet long, of three stories in height, with basement or cellar, at the price of five thousand dollars, to be secured by the bonds of the Board of Commissioners, payable in five equal annual instalments, bearing interest at the rate of six per centum per annum, and agree to execute title to the same upon payment of the purchase-money and interest, and to execute to this board a bond, with surety, to perform this agreement; and whereas a majority of the justices of said county have in writing directed this Board of County Commissioners to accept the offer of the said L. M. Hornthal, and to make the purchase of said property upon the terms named:

"It is ordered by this board, a majority of said justices concurring, that James G. Ausbon, chairman of this board, contract with the said L. M. Hornthal, through his agent, L. H. Hornthal, for the purchase of said property; that he take from the said L. M. Hornthal his bond, with surety as above provided, and that he execute, as chairman of this board, five bonds, each for one thousand dollars, payable severally 1st October, 1878, 1879, 1880, 1881, 1882, bearing six per centum interest; that he cause the same to be countersigned by the clerk of this board, who is the register of deeds for this county, and that the seal of his office be attached. (Signed)   J. G. Ausbon, Chairman."

The transcript of the record of the proceedings of a special meeting of the Board of County Commissioners, held on the first Monday, November 5, 1877, was also put in evidence, wherein it appeared as follows: J. G. Ausbon, as chairman, reported in writing "that in obedience to the order of this board

proposed on the 1st day of October, 1877, he accepted the bond of L. M. Hornthal, of the city of New York, in the penal sum of ten thousand dollars, with justified surety, conditioned to execute title to this Board of County Commissioners for the brick store and lot in Plymouth, known as the custom-house, upon payment of the purchase-money, and that under said order he executed to him five bonds, each for one thousand dollars, dated the 1st day of October, 1877, bearing six per cent. interest from date, payable at one, two, three, four, and five years from date, which were countersigned by the clerk of this board, and sealed with the seal of his office as register of deeds, and that he has caused the said title bond to be proved and registered."

It was thereupon ordered that the report be adopted, and that the action of the chairman in the premises be in all respects confirmed and approved. All the commissioners were present at this meeting.

Upon this state of case, the court directed the jury that the plaintiff was entitled to recover, and there was verdict and judgment accordingly.

It is now contended by the plaintiff in error that the ruling of the court, and the judgment rendered in pursuance thereof, are erroneous on two grounds: First. That by the laws of North Carolina in force at that time, and applicable to the transaction, the commissioners of the county had no power to change the site of the county court-house, unless authorized to do so by a unanimous vote of all the members of the board at their September meeting, and after a notice of the proposed change, specifying the new site, published in a newspaper printed in the county and posted in one or more public places in every township in the county for three months next immediately preceding the annual meeting at which the final vote on the proposed change was to be taken; and upon that point he cites the Laws of North Carolina, 1868, c. 20, § 8, sub-sec. 8; and Battle's Revisal, 1873, c. 27, § 8, sub-sec. 8. Second. That the Board of Commissioners did not have the power to make the contract in question, and the bonds in pursuance and execution of the same, "without the concurrence of a majority

of the justices of the peace sitting with them," in pursuance of § 5 of the Laws of North Carolina of 1876–1877, c. 141.

The statute of North Carolina referred to in support of the first assignment of error is the Act of 1868, c. 20. It provides for the organization and government of counties, and enacts that every county is a body politic and corporate, and has the powers specified by statute or necessarily implied in such a body, which can only be exercised by the Board of Commissioners or in pursuance of a resolution adopted by them. Among its general powers enumerated is, "to purchase and hold land within its limits, and for the use of its inhabitants, subject to the supervision of the General Assembly." The Board of Commissioners of each county are required to hold a regular meeting at the court-house on the first Mondays of September and March of each year. They are expressly authorized " to purchase real property necessary for any public county building, and for the support of the poor, and to determine the site thereof where it has not been already located;" also, to locate the necessary county buildings, and to raise, by tax upon the county, the money necessary for their erection. Subdivision 8 of § 8 of the statute is as follows: " To remove or designate a new site for any county building ; but the site of any county building already located shall not be changed unless by a unanimous vote of all the members of the board at the regular September meeting, and unless upon notice of the proposed change, specifying the new site. Such notice shall be published in a newspaper printed in the county, if there be one, and posted in one or more public places in every township in the county for three months next immediately preceding the annual meeting at which the final vote on the proposed change is to be taken. Such new site shall not be more than one mile distant from the old, except upon the special approval of the General Assembly."

It is for want of conformity to the directions of this clause that it is contended that the proceedings of the County Commissioners of Washington County in the purchase of the court-house building which constitutes the consideration for the obligations in suit, are illegal. We are of opinion, however, that

the provisions of that sub-section do not apply to the circumstances of the present case. The language of the law is limited to the removal or designation of a new site for an existing county building, and cannot be applied to a case such as the present, where the court-house has been destroyed by fire. It was the duty of the commissioners, after the destruction of the existing court-house, to provide a place where the courts could be held, and a building suitable for the purpose. The renting of a building in another locality cannot be considered as a removal or designation of a new site for the county building, already located. Where a county building has been destroyed by fire, its site cannot be said any longer to exist as a location. A literal adherence, as required by the argument for the plaintiff in error, to the terms of the section in its application to this case leads to a necessary absurdity, for the regular September meeting, at which the unanimous vote of the board must be given, which it is contended is a necessary condition precedent to the validity of the transaction, is required to be held at the court-house, but, according to the circumstances of this case, there was no court-house at which any such meeting could be held. By the terms of the law the County Commissioners have power to designate the site of any county building not already and previously located, and the terms of the sub-section relied on apply, we think, only to the case where it is a naked proposition to abandon one building, then in use for county purposes, and to establish another one in another site for the same purpose.

In the present case, also, if there was any change in the site of the county building, it took place immediately after the destruction by fire of the old one, when the premises subsequently purchased were leased by the commissioners and occupied as a county court-house. This had been done five years previously. In the meantime the occupancy of the place in question as a court-house had been public and notorious, so that, we think, it may be considered at the time when the purchase of the property was made that the site for a county court-house had been already established. The change of title from that of lessee for a term of years to an ownership in fee

by reason of the purchase was not a change of the site of a county building. It, therefore, does not come within the prohibition relied on.

As to the second assignment of error, reliance is had upon an act to establish county governments, ratified February 27, 1877. Laws of North Carolina, 1876–1877, c. 141, p. 226. That was a statute which enacted a new mode of governing counties. It provided in § 4 that justices of the peace should be elected by the General Assembly, and the General Assembly, it was provided, at its then present session, should elect three justices of the peace for each township in the several counties of the State, to be divided into three classes, and hold their offices for the terms of two, four, and six years respectively; but the successor of each class, as his term expired, should be elected by the General Assembly for the term of six years. It was also provided that the terms of those elected at the then present session of the General Assembly, should begin at the expiration of the terms for which the justices of the peace then in office had been elected, and not before. Section 5 enacted that justices of the peace for each county, on the first Monday in August, 1878, and on the first Monday in August every two years thereafter, should assemble at the court-house of their respective counties, and, a majority being present, should proceed to the election of not less than three, nor more than five, persons to be chosen from the body of the county, including the justices of the peace, who should be styled the Board of Commissioners for the county, and hold their offices for two years from the date of their qualification, and until their successors should be elected and qualified. Those elected on the first Monday in August, 1878, were to enter upon the duties of their office immediately upon the expiration of the term for which the Board of County Commissioners then in office had been elected, and not before. The same section contained the following proviso: "*Provided, however,* That the Board of Commissioners shall not have power to levy taxes, to purchase real property, to remove or designate new sites for county buildings, to construct or repair bridges, the cost whereof may exceed five hundred dollars, or to borrow

money for the county, nor alter or make additional townships, without the concurrence of a majority of the justices of the peace sitting with them; and for the purposes embraced in this proviso the justices of the peace of the county shall meet with the Board of Commissioners on the first Monday in August, one thousand eight hundred and seventy-eight, and annually thereafter, unless oftener convened by the Board of Commissioners, who are hereby empowered to call together the justices of the peace, when necessary, not oftener than once in three months; but for such services the justices of the peace shall receive no compensation."

The next section of the statute provided that the Board of Commissioners so elected should have and exercise the jurisdiction and powers vested in the Board of Commissioners then existing.

It is quite evident, we think, that the proviso to § 5, which is relied upon as prohibiting the exercise of the powers specified, except in conjunction with the justices of the peace sitting with the Board of Commissioners, applies only to those commissioners who should be chosen thereafter under the provisions of that act, the first election under which could not occur prior to the first Monday in August, 1878; and that those then elected could not enter upon the duties of their offices until after the expiration of the term for which the existing Boards of County Commissioners then in office had been elected. The limitations upon the powers of the commissioners under that statute cannot be construed as affecting the powers of the Boards of Commissioners in office at the date of this transaction, which was in the year 1877. The Act of February 27, 1877, therefore, has no application to this case. There is, therefore, no error in the record, and the judgment of the Circuit Court is

*Affirmed.*