## W. D. H. Washington et al. v. Rosario Mining and Milling Company et al.

### Decided March 10, 1902.

**1.—Contract of Sale—Option—Breach—Burden of Proof.**

Where plaintiffs sued for damages for breach of an option contract for the purchase of certain mining properties, which option had been extended by an agreement of defendant company that if plaintiff satified defendant by February 1st that they could carry out the contract to buy the property on the terms of the option, then about to expire, they could have until March 10th to consummate the sale, the burden was on plaintiffs to show that, within the stipulated time, they had performed such acts or given such assurances as satisfied or were reasonably sufficient to satisfy defendant of their ability to carry out the terms of the sale as proposed.

**2.—Same—Evidence—Corporation.**

In the absence of any resolution by the board of directors of defendant corporation expressing satisfaction as to plaintiffs' ability to carry out the contract, it was admissible for defendant to show by the testimony of its officers and agents that plaintiffs did not, by February 1st, satisfy them or either of them of plaintiffs' ability to complete the purchase under the terms stipulated.

**3.—Same—Fact Case—Evidence Held Insufficient.**

Evidence considered and held not sufficient to show that plaintiffs were ready, willing, and able to comply with the terms of the contract and had offered to do so before the expiration of the stipulated time, and as not showing that certain acts and declarations of defendant's secretary amounted to a waiver or change of the conditions on which the option was extended.

**4.—Same Merchantable Title Sufficient.**

Since the option contract was silent as to the title to the property to be conveyed, it was sufficient on the part of the defendant vendor that it was in condition to convey a merchantable title.

**5.—Same—Acceptance of Offer—Change.**

Where the purchaser's acceptance of an offer to sell is not an unconditional one, but imposes new terms or departs from those offered, it is not sufficient, and amounts in law to a rejection of the offer.

**6.—Same—Time of the Essence—Expiration of Option.**

Where an option to purchase requires an acceptance within a stipulated time, time is of the essence of the contract, and the option expires at the date named without any notice of forfeiture.

Appeal from Tarrant.   Tried below before Hon. Irby Dunklin.

*Callaway & Gambrell, E. P. Morey, Greene & Stewart,* and *R. H. Buck,* for appellants.

*Cowan & Burney* and *Pruitt & Smith,* for appellees.

CONNER, CHIEF JUSTICE.—In this case we are confronted with a transcript of 1041 pages, and with briefs presenting some seventy-three assignments of error.   This statement merely will render obvious the futility of any effort to dispose of all questions presented in detail.   We must perforce content ourselves with a determination in a general way of such questions, and such questions only, as in our judgment are material in view of the conclusions reached by us.   Thus treated, the difficulty in disposition is largely one of labor.

Briefly stated, the suit was instituted by appellants, William D. H. Washington and Fred Howard Porter, against the appellee mining company, Ben J. Tillar, J. A. Walker, F. W. and N. W. McConnell, and others as to whom the suit was afterwards dismissed, for damages in a large amount for the alleged breach of an option contract for the sale of certain mining properties owned by the appellee company, and situated in the republic of Mexico.

The contract for the breach of which appellants sued, was given July 19, 1899, to expire October 15, 1899, but extended October 12, 1899, as hereinafter stated.   Omitting terms not necessary to notice, the July contract provided that W. D. H. Washington and his associates should be given an option until October 15, 1899, to purchase the mining properties herein described for the sum of $800,000, gold, of which $100,000 cash was to be paid on or before said October 15; $100,000 one year thereafter; $300,000 two years thereafter, and $300,000 three years thereafter.   For the deferred payments notes of the purchasers were to be given bearing interest at the rate of 6 per cent per annum, and secured by a first mortgage lien on all the properties sold, with a stipulation that in case of default in the payment of any one or all of said notes the holder should have the option to declare a forfeiture of all previous payments made, and likewise of the property conveyed, with right of immediate repossession "without judicial ascertainment."   No sale having theretofore been effected, on October 12, 1899, the appellee company executed another option contract giving Washington the right until March 10, 1900, to sell or to purchase the aforesaid properties for $800,000 in cash.   It seems that this contract was entered into with a view of an ultimate sale by Washington to Haggin and Daly, but inasmuch as there is no evidence of an offer on the part of appellants to comply with its terms, it will not be set out.   Indeed, it is expressly stated in the supplemental brief and argument in behalf of appellants, that "Appellants did not, after January 27, 1900, and do not now, undertake to carry out the contract and covenants contained in the resolutions

of the defendant company, dated October 12, 1899, as their pleadings and the record will show." We therefore eliminate the contract of October 12th and all questions dependent thereon. On the same day, however, and transmitted therewith, the following letter or contract was executed, to wit:

"The Rosario Mining and Milling Company. Fort Worth, Texas, October 12, 1899.—Mr. W. D. H. Washington, New York City: Dear Sir.—Referring to the option contract this day given to you to purchase the property of the Rosario Mining and Milling Company in Mexico, I have to say that in the event that you shall for any reason fail to make the sale to Haggin and Daly, contemplated, this company will give you an opportunity to sell the same property to other persons, if you can do so by February 1, 1900, upon the same terms which were offered to you in the option contract with you which expired October 15, 1899. A commission of 5 per cent on the cash payments to be allowed the same as if the sale should be made strictly under your option this day given you looking to a sale for cash. If you satisfy us by the first day of February, 1900, that you can carry out the contract to buy said property upon the terms of said option on time terms, then you can have until March 10, 1900, to consummate such sale. Rosario Mining and Milling Company. Ben J. Tillar, Secretary."

We find no resolution of the board of directors of the appellee company authorizing this letter, but it is treated in behalf of appellee as an authorized extension, upon the terms therein stated, of the option of date July 19, 1899, and we therefore so consider it.

Among others, the pleadings, evidence, and charge present the following issues: (1) Did appellants satisfy the appellee company "by the 1st day of February, 1900," that they could "carry out the contract to buy said property upon the terms" of said July option, as required in the instrument of extension? (2) Were appellants in fact ready, willing, and able to perform on their part the contract sued upon on or before March 10, 1900, and did they offer to do so?

The jury by their verdict, in effect, answered these questions in the negative, and after a painstaking consideration of the record, we have concluded that the judgment of the trial court approving that verdict must be sustained. The evidence sustaining the verdict on the first question, supra, may be thus briefly summarized:

The option contract of October 12, 1899, and a former contract with one Balcom, secured by appellants, but which expired before October 12th, provided for an examination of the properties involved by experts at the cost of the contemplated purchasers. It appears that several of such examinations had been made, involving an expense to appellants of some $23,000, and over, notably one by William H. Emanuel, whose report thereof was very favorable to the appellee company. On January 27th Washington wrote to Tillar, secretary of the company, the following letter:

"The New York and New Jersey Water Company, New York, Jan-

uary 27, 1900.—Ben J. Tillar, Esq., Secretary Rosario Mining and Milling Company, Fort Worth, Texas: Dear Sir.—In accordance with the requirements of your agreement addressed to me, and dated on the 12th day of October, 1899, referring to and concerning the option given to me to purchase the property of the Rosario Mining and Milling Company in Mexico, I hereby notify you that I have failed to make a sale of said property to Messrs. Haggin and Daly for the reasons already given you. I have, however, arranged a sale of said property to other parties upon the terms contained in my option which expired October 15, 1899, and notify you that I can carry out the contract to buy said property upon the terms and can consummate said sale on March 10, 1900, the date provided in your said agreement of October 12, 1899. Yours very truly, Wm. D. H. Washington."

To which Tillar replied by telegram on January 30th, as follows: "Replying to your letter 27th, you must satisfy us February 1st by deposit or guaranty." To which Washington replied to Tillar by telegram on January 31st as follows: "My option requires payment on March 10th, no provisions for deposit or guaranty prior thereto. My people have agreed to make payment as required by option notice of January 27th, sent you to keep alive terms of first option; second option still in existence." On January 30th Washington wrote to Tillar, secretary, a letter denouncing Emanuel and Emanuel's report as being worthless, on the last page of which he says: "I telegraphed you to-day my object in my notice of January 27th, and have no doubt you will understand the exact position, and that that notice has no effect ·upon my second option dated October 12th, 1899. I expect to secure a copy of Farrish's report to-morrow, though a great expense, but I feel that I must have something authoritative and disinterested. If I am .successful in getting it, I will probably write you on the subject in a day or so. Meantime I will not write further except to assure you that everything is going smoothly and looks to a speedy consummation of our negotiations. But will need new examination."

On February 3d Washington wrote Tillar, in part, as follows: "In accordance with my letter of 30th ult., I beg to inform you that I have secured a copy of Farish's report and carefully gone over same. I greatly regret to find it so unfavorable as to be practically worthless to anyone." After quoting at length from that report, he underscores the concluding words, to wit, "which makes me hesitate to recommend it to you." Washington proceeds: "I have given you a few of the points he brings up, enough to show you what his opinion of the property is. From this it appears that Farish was unable to find ore values of more than $13.50 per ton. Wilson's results are not much better than this, so the query naturally arises, where did Emanuel get his samples, and why does his averages run so high? Please consider that I am not endeavoring to pound the property at all; I am only quoting disagreeable and discouraging facts."

On January 28th appellant Porter wrote to Tillar and set forth with great detail what he terms the perfidy of Emanuel, in which he says: "At this moment, so far as Mr. Emanuel's report is concerned, we know absolutely no more than we did the first time we read Mr. Balcom's report. We have had and have now bona fide purchasers for the property if it would stand examination, and through Mr. Emanuel's treachery we have been put in a most mortifying and disagreeable position, and through precisely the same reasons you can but feel that time has been lost,—wasted; it has. I am sure, however, that you will all concede that we are equally the sufferers with yourselves, and that we are both equally duped by the gentleman in whom we had such confidence. Therefore, we, as holders of the option, are not responsible for the present condition. We have been duped, hoodwinked, swindled; and through the same party you also have suffered, but you have not suffered through us. * * *" He further says: "One thing I will say to you with all possible frankness, the next examination of your property will be made by experts whose reputation is unquestioned and whose reports have a commercial value all over the world. When we get through we shall know what there is in your property, and not have to content ourselves with thinking and imagining and trusting it to be so and so."

Each of the defendant's officers and agents testified that plaintiffs did not, on or before February 1, 1900, satisfy either of them of plaintiff's ability to purchase said property.

The evidence cited seems conclusive against appellants on the issue to which it has been addressed. It is insisted in a number of assignments of error that the court erred in receiving the said testimony of appellee's officers and agents, but the contention seems unsatisfactory. The evidence fails to show that appellants, prior to February 1, 1900, had made with others any enforcible contract for the sale of the properties involved, as contemplated in one aspect of the extending note of October 12, 1899, and to be in position to insist upon an enforcement of their right to themselves become the purchasers as comprehended in another view of said note, the burden was certainly upon them to show, within the stipulated time, unless excused therefrom, that they had performed such acts or given such assurances as satisfied, or as were reasonably sufficient to satisfy, appellee company or its officers and agents of the ability of appellants, if any, to "carry out" the terms of the sale as proposed. Killough v. Lee, 21 S. W. Rep., 970; Coughlan v. Bigelow, 164 U. S., 301, 41 L. Ed., 443; Kelsey v. Crowther, 162 U. S., 404, 40 L. Ed., 1017; Telfner v. Russ, 162 U. S., 170, 40 L. Ed., 934; Higgins v. Eagleton, 155 N. Y., 468, and note; Pom. Spec. Per. Con., secs. 360, 387, 411; Weaver v. Burr, 3 Law. Rep. Ann., 94; also 21 Law. Rep. Ann., 127, and notes; Mining Co. v. Mining Co., 47 Pac. Rep., 98; Townsend v. Tufts, 30 Pac. Rep., 529; 1 Warv. on Vend., 187. See also, James v. Darby, 40 C. C. A., 341, 100 Fed., 224; Railway v. Columbus Mill Co., 119 U. S., 151, 30 L. Ed., 377.

The note contains the term "satisfy us," which appellees contend has reference to the individual officers or agents of appellee company by whom the negotiations were conducted, but if treated as referring alone to the appellee company, as insisted by appellants, then the testimony of said agents was clearly relevant to the issue in the absence of some formal resolution or action of the board of directors expressing such satisfaction. No evidence was offered of any such action on the part of appellee's board of directors, and in the absence of such action it is difficult to apprehend what better evidence on the issue than that of the individual officers of appellee could have been offered. Indeed, the individual declaration and act, so far as shown by the record, of the secretary of the appellee company is made the basis of the further contention by appellants that appellee was satisfied of appellants' ability to comply with the option contract; or at least was estopped from denying it. The declaration and act referred to was, first, a letter written by appellee's secretary, Tillar, to appellant Washington February 20, 1900, the concluding sentence of which was: "From the nature of your telegram it would seem that you and your associates intend to purchase the property on or before March 10, 1900; and second, the act of said secretary in directing the custodian of appellee's title papers to deliver the same to appellants' attorneys for examination, as requested in telegram from appellant Washington on February 19, 1900. If it be conceded, which we are not inclined to do in the absence of authority therefor from appellee's board of directors, that the declaration and act of the secretary must be considered as that of the company, they nevertheless fail to fill the terms of the option contract on the subject. They are inconclusive in nature, particularly in view of Tillar's telegram to Washington on January 30, hereinbefore quoted, that "you (Washington) must satisfy us February 1st by deposit or guaranty." The secretary thereby doubtless indicated his own willingness and possibly the willingness of the other officers of the appellee company to yet complete the sale upon the terms named in the option contract of July, 1899, but such declarations and act of the secretary in our judgment fall short of a binding agreement to do so, or to waive the conditions upon which the July option was extended. Besides, appellants have no pleading setting up a waiver or estoppel, and they are therefore in no position to invoke this feature of their contention. We conclude that appellees were not satisfied at any time of appellants' ability to fulfill the option contract mentioned.

Nor do we think the evidence relating to the second issue hereinbefore suggested more favorable to appellants. As explanatory of the evidence hereinafter quoted we state that presumably the expert examinations of the mine by Emanuel and others theretofore made were not acceptable to Daly and Haggin, and therefore that said option of October 12, 1899, among other things, was made to especially provide that it should become null and void unless appellant Washington should procure Haggin and Daly to select a reputable expert and have him at the mine

in question on or before December 1, 1899, for the purpose of making a thorough and full examination of said property under the option. It was also provided that concurrently with such exploitation of the mine Washington should cause to be examined and passed upon the title to the property, to the end that no time beyond the expiration of the option should be required or granted. With this explanation we give the following further brief synopsis of the correspondence that passed between the parties: October 20th, Washington wrote Tillar reporting delay and difficulty in Haggin and Daly securing experts; October 24th, Washington advises Tillar that Wilson and Gilley are selected as Haggin and Daly's experts. This is corrected on November 2d to "Winchell" and Gilley; October 30th, Washington wires Tillar "must unwater mine, greatly delayed getting sectional pump," etc.; November 16th, Washington reports great difficulty getting experts, various delays, sickness, lawsuits, etc.; November 21st, Washington wires that Haggin is endeavoring to find other available experts and asking for two months extension; November 21st, Washington writes confirming wire, saying "that they must have this examination made by experts who have been long in their employ;" November 23d, Haggin wires "Impossible to send expert by December 1st. Those I expected to send are engaged in litigation and can not leave. If you grant Washington's request will send expert as soon as possible;" November 26th, Tillar wired Washington "Directors can not give you extension requested;" November 27th, Washington wires for thirty days extension; November 27th, Tillar answered, "We can not grant you extension;" November 29th, Washington writes Tillar that Haggin will send a Mr. Wilson from Guanacevi to examine the mine, also others to follow; December 6th, Washington writes and explains delays and that Molson was the expert that Haggin expected to use; December 15th, Washington wrote to Peacock setting forth Molson as the man and excusing delays; December 13th, Washington wires Tillar, confirming same by letter of 15th, that Molson left New York for Mexico, arranged to meet Emanuel, and expected to go to the mine; December 20th, Rosario Company wired Haggin asking when Molson would examine the mine; December 21st, Haggin replied "Can not tell, Molson engaged at City of Mexico;" December 22d, Tillar wrote Washington complaining of delay—demanding good faith, etc.; December 22d, Peacock wired Wilson at Guadalupe y Calvo to know if he was going to unwater the mine; December 23, Wilson answered in the negative. December 23d, Washington by letter reports further misfortunes, and that Wilson & Son had decided against the mine. This letter sets out the history of the whole transaction of Emanuel's incompetency and worthlessness of his report, and says: "Personally I shall not be satisfied without an authoritative examinaton." December 30th, Tillar wrote Washington, "In justice to ourselves and property we can not submit to a superficial examination of the property. Hence if you and your associates are not prepared and ready to make a thorough and

complete examination of the mine we see no reason why we should be longer tied up under the present option." January 4th, Washington wrote Tillar, among other matters, "We are as desirous as you can be that whatever examination is made may be thorough and authoritative; we wish to settle beyond question whether the property is in accord with reports made to us, or whether these gentlemen making reports have been led into serious error; as I have said in my letter of December 23d, I shall not be satisfied until such authoritative examination shall have been made." He further suggests: "It would be wise for us to combine to positively determine this question of value at once." January 9th, Tillar replied to letter of January 4th and December 23d, setting forth that no thorough examination had been attempted by Wilson; that the mine had been examined without unwatering, and added, "I infer from your last communication that you can not proceed further with your option, and that it will be entirely agreeable for us to take such steps concerning the property as we may think to our interests." January 9th, Washington writes Tillar of presenting the property to a number of parties,—says the letter is to apprise Tillar "of my ability to handle your property at first hand provided the property will stand the representations made." He asks for something to remove lack of confidence. January 12th, Washington writes Tillar, referring to Haggin, "We were to buy it together. * * * We shall proceed with option and expect to purchase if property satisfactory." January 13th, Washington wires Tillar in explanation and in answer to letter of 9th. Says he refuses to relinquish the option because difficulty arose from one equally trusted, and because "we are justified in the fullest confident belief that we shall be able to arrange to take the property. * * * It is the intention of myself and friends who are now interested in this property, to have an examination of the property which shall satisfy us, and as to this we will acquaint you shortly."

Then follows the correspondence hereinbefore quoted under the first proposition. When to this we add that there is no evidence whatever that appellants at any time tendered the cash payment and notes required of them by the option contract of July 19, 1899, it seems manifest to us that appellants' whole case must fall unless the want of such tender be excused. The excuse offered and urged March 9 and 10, 1900, when appellant Porter was in Fort Worth, and that is now urged is, that appellee's title to the property involved was defective. Mr. Porter in testifying as to the transactions in Fort Worth, March 9th and 10th, among other things, says: "I was demanding an extension of time for the purpose of your perfecting your titles. I refused to pay any money until you had your title perfected; you could not refuse to make me a conveyance; I intended, if you could make the conveyance, to pay the money; we had the money in New York; as to where it was in New York, I will have to refer you to the people in whose charge it was. * * * I don't know which one of you gentlemen asked me if I had $100,000 in my pocket to pay for that property, if you could give

title to that property, and I said I did not, and you asked me how I knew I could do it; I did not personally have the money; the money was in New York; you will have to ask Colonel Washington about where it was in New York; I did not know where it was; I did not furnish you any information as to where it was."

Mr. Washington testified: "I was relying upon getting the money by getting it from the subscriptions of these gentlemen, that have been introduced in evidence.   *   *   *   If I had taken this property and paid the $100,000, I was going to pay the money myself, Mr. Buck and Mr. Beal; we had never gotten to the point as to whether the conveyance was to be made to Porter and myself, or to the company that had subscribed to it.   *   *·   *   We expected to organize a company on this mine, make a flotation to form a· company, and the company would doubtless have been the person giving the notes.   We issued a prospectus, I believe, of what we proposed to do with the company, and how we proposed to organize the company, so we would not have been required to give our individual obligations.   *   *   *   The $100,000 that I was to pay for this mine, I don't know that I had it in the bank at that time, but I had securities on which I would readily raise my part of it. *   *   *   I said on the 10th of March I was ready, but there were things constantly cropping out that might have made me change my mind.   We got ready about the 1st of February; we got our crowd together; I don't think I personally said that I had any written contract with reliable people that I had sold this property; I did not propose to you the name of a single individual that you could telegraph to or have the bank examine, that I had sold this property to; I don't think I offered you any evidence of any character that I could sell the property. *   *   *   When it came down to a finish I was ready to put up my $100,000 and my associates with me for the purpose of holding the property for another year.   *   *   *·   I did not offer this company any security in the way of notes and mortgages on the part of myself, or Messrs. Buck and Beall, or any other persons for the balance of the consideration besides the $100,000."

· This evidence we think plainly tends to show not only that appellants failed to· make tender of performance on their part, but also that they were then unwillng, if not unable, to make any binding acceptance of the option contract without further examination of the properties. The objection to the title made, under the circumstances, suggests the idea that this objection was but a mere pretext to gain time.

The basis of the contention that the appellee's title was defective seems to be the report made thereon by a Mexican lawyer by the name of Filipe ·Seijas, and the contention that fourteen pertinencias comprehended in the terms of the contract stood in the name of F. W. McConnell, and to which the appellee had· no title.   The opinion of Mr. Seijas covers·title other than that which stands in the name of McConnell.   We will not undertake to set out the report of Mr. Seijas, and perhaps can not make it very clear without doing so, but will state that,

while defects in certain conveyances are pointed out, other facts are referred to which seems to render them immaterial, and he concludes his report with the statement: "In conclusion, the original title which protects the mine called 'Nuestra Senora del Rosario' is perfect, inasmuch as the number of pertinencias adjudicated to the denouncers does not exceed what each of them individually could acquire, and in case there is an excess of pertinencias, that according to article 45 of the mining law, each one of the denouncers could acquire such excess under such laws."

Mr. Seijas also testified on the trial, and in referring to said opinion says, among other things: "The only objection I could make in my opinion then to the titles is as to such excess as there might be in the pertinencias, and that is the only objection I could make at that time." There was no proof of an excess in pertinencias to which the objection thus indicated could apply.

The state of the McConnell title, in substance, was that F. W. McConnell, while employed as manager of the appellee company in Mexico, in his own name, denounced under the mining laws of that Republic fourteen pertinencias for the benefit of the appellee company. Afterwards, on December 16, 1899, McConnell and wife executed and acknowledged a deed to said fourteen pertinencias to the company. There was some contention in the evidence as to whether this deed had been delivered, but we think the evidence sufficient to support appellee's contention that it had. So that, on the whole, we have been unable to say that appellee's title to all of the property involved was not a marketable one.

Washington, in testifyng with reference to the title, among other things said: "I have stated that we would have taken the property if the defendants would have cleared up the titles; didn't care for the McConnell deed—I wanted the whole thing clear. No man would buy a piece of property when his lawyer says it is not good. I would not have taken it without they cleared the whole matter from start to finish."

Porter testified, referring to the date of March 10th: "I demanded of Mr. Tillar that the company get a conveyance from McConnell as a condition to our taking the property." "Q. Did you offer to take the property if we would do that thing?" "A. I didn't specify that thing alone; no sir, I put all the titles together. I did not offer to take it upon that one condition; I put them all together; precisely what my letter states. * * * I made no demand for the defendants to get a conveyance from McConnell, as the sole reason. That was one of the reasons, not the sole reason. * * * I reiterated that we were in a position to buy and pay for their property so far as our first payment was concerned, which was all we were obligated to do at that time."

It will be observed that the contract of July 19, 1899, failed to provide upon the subject of titles specifically. Hence all that could have been required of appellee was to be in condition upon performance or

upon tender of performance on the part of appellants to convey a merchantable title, and this, as we have concluded, they had.

Mr. Pomeroy, in his work on Specific Performance of Contracts, section 387, says: "Where the contract is really an offer on one side, with a provision that this offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified date, then of course the act of assent or payment must be done within the prescribed time, and time is from the very form of the contract essential. If, therefore, a vendor agrees to convey, if payment be made at or before a given date, or if an option is given which is accepted by payment within a given time, then the time of the payment is certainly essential; in fact, payment is a condition precedent to the vesting of any right in the vendee. If, however, the offer or option given requires an assent and acceptance within a given time, such assent must be made within the time prescribed, and the contract thereby becomes concluded and mutual; but whether time is essential with respect to its subsequent performance, must depend upon its object or the nature of its subject matter." This is approved in Killough v. Lee, supra.

In section 411, same work, he says: "And, for the same reason, the delay of the vendee in deciding whether he will accept or reject the title offered him by the vendor, operates unfairly and unequally, and must be justified, because the vendee can enforce whether the title is good or bad, while the vendor can only enforce when the title is good, and the parties do not, therefore, stand upon the same footing." An offer to sell lands and acceptance, provided the title is perfect, does not constitute a binding contract. Corcoran v. White, 57 Am. Rep., 858, 117 Ill., 118; Sawyer v. Brossart, 56 Am. Rep., 371, 67 Iowa, 678.

In Kelsey v. Crowther, 162 United States, 1019, the rule is thus stated: "The action was in the nature of a bill for specific performance for the sale and purchases of a tract of land. If the contract is construed as making it the duty to tender the abstract, yet his failure to do so did not dispense with performance or the offer to perform on the part of the complainants. His failure to furnish the abstract might have justified the complainants in declaring themselves off from the contract, and might have formed a successful defense to an action for damages brought by Crowther. But if they wished to specifically enforce the contract, it was necessary for the complainants themselves to tender performance. To entitle themselves to a decree for a specific performance of a contract to sell land, it has always been held necessary that the purchasers should tender the purchase money. This is the rule in the ordinary case of a mutual contract for the sale and purchase of land. And the rule is still more stringently applied in the case of an optional sale, like the present one, where time is of the essence of the contract, and where Crowther could not have enforced specific performance. In such a case, if the vendee wished to compel the other to fulfill the contract, he must make his part of the agree-

ment precedent, and can not proceed against the other without actual performance of the agreement on his part, or a tender and refusal."

Again the Supreme Court says, in French v. Hall, 119 United States, 377; "The rules of law which govern this case are well settled. As no contract is complete without the mutual assent of the parties, an offer to sell imposes no obligation until it is accepted according to its terms. So long as the offer has neither been accepted nor rejected, the negotiation remains open, and imposes no obligation upon either party; the one may decline to accept, or the other may withdraw his offer; and either rejection or withdrawal leaves the matter as if no offer had ever been made. A proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modifications suggested. The other party having once rejected the offer, can not afterwards revive it by tendering an acceptance of it [citing Eliason v. Hensaw, 4 Wheat., 225, 4 L. Ed., 556; Carr v. Duval, 14 Pet., 77, 10 L. Ed., 361; Bank v. Hall, 101 U. S., 43, 50, 25 L. Ed., 822-825; Hyde v. Wrench, 3 Beav., 334; Fox v. Turner, 1 Bradw., 153]. If the offer does not limit the time for its acceptance, it must be accepted within a reasonable time. If it does, it may, at any time within the limit and so long as it remains open, be accepted or rejected by the party to whom, or be withdrawn by the party by whom, it was made." Citing Railway v. Bartlet, 3 Cush., 224; Dickinson v. Dodds, 2 Ch. Div., 463.

The Supreme Court of New York thus states the rule: "The general rule, however, to be deduced from an examination of the leading authorities seems to be that in cases where by the terms of the contract the acts of the parties are to be concurrent, it is the duty of him who seeks to maintain an action for a breach of the contract, either by way of damages for nonperformance, or for the recovery of money paid thereon, not only to be ready and willing to perform on his part, but he must demand performance from the other party." Higgins v. Eagleton, 155 N. Y., 474.

In the case of James v. Darby, 40 Circuit Court of Appeals, at page 345, it is said: "The rule is unvarying, and the authorities uniform, that in order to constitute an acceptance of an option, or an offer to sell, the acceptance must be unconditional. There must be no new terms imposed, and no departure from those offered. 'If to the acceptance a condition be affixed, or any modification or change in the offer be requested, by the party to whom the offer is made, this, in law, constitutes a rejection of the offer.'" Citing Weaver v. Burr, 31 W. Va., 736, 8 S. E. Rep., 743, 3 L. R. A., 94; Kelsey v. Crowther, 162 U. S., 404; Harding v. Gibbs, 125, Ill., 85, 17 N. E. Rep., 60; Corcoran v. White (Ill. Sup.), 7 N. E. Rep., 525; Langellier v. Schaefer (Minn.), 31 N. W. Rep., 690; Sawyer v. Brossart, 67 Iowa, 678, 25 N. W. Rep., 876; Bruner v. Wheaton, 46 Mo., 363; Railway v. Mill Co., 119 U. S., 151, 30 L. Ed., 376; Lawson on Con., pars. 15-17. "An option to buy

land at a certain price by a date named expires on such date without any 'notice of forfeiture." Cummings v. Town Realty Co., 57 N. W. Rep., 43.

In the light of these authorities we conclude from the evidence that appellants made no such acceptance of the offer contained in the option contract upon which they sue, and made no such tender of performance on their part as was requisite, and that no evidence of such excuse in failing to make the necessary acceptance and tender has been presented as will relieve them from the effect thereof.

We have carefully examined the charges given and refused, the many objections made to the introduction and rejection of evidence and to the action of the trial court in limiting the cross-examination of witnesses by appellants that relate to the issues hereinbefore treated, but we find no reversible error in these proceedings as assigned, and will not further extend this opinion by discussing them. The remaining assignments as indicated will be overruled as immaterial. The judgment is affirmed.

*Affirmed.*

· Hunter, Associate Justice did not sit in this case.