NATIONAL LIFE INS. CO. OF UNITED STATES v. EGGLESTON. (No. 688.)

(Court of Civil Appeals of Texas. El Paso. May 3, 1917. On Rehearing, June 14, 1917. Additional Finding of Fact, June 28, 1917.)

1. INSURANCE ☞144(1)—CONTRACTS—EXECUTION.

Where insured under $10,000 policy commenced negotiations for reduction to $5,000, which the insurer accepted on condition that the original policy be surrendered and on receipt of proper application, which application was made out by insured, but was defective, though he in good faith attempted to make a proper application, and before the agent called his attention to the defect he became insane, so that while sane he at all times believed he had complied, there was no abandonment of negotiations.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 273–275.]

2. INSURANCE ☞144(1)—CONTRACTS—EXECUTION.

In such case, the mere fact that the minor beneficiary had no guardian who could consent to reduction was immaterial, the policy being ordinary life, nonparticipating, so that the insured could, at any time, abandon it entirely.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 273–275.]

3. INSURANCE ☞144(1)—CONTRACTS—EXECUTION.

Such acts constituted a contract of insurance for the reduced amount.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 273–275.]

4. INSURANCE ☞362 — CONTRACTS — EXECUTION—TENDER OF PERFORMANCE.

In such case, where insured gave his premium notes for the reduced policy, but the company never accepted them, the insured's failure to tender the amount of notes when the company made no demand therefor did not forfeit the policy, since he had a right to presume that tender was unnecessary.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 925–930.]

5. ELECTION OF REMEDIES ☞12—WHAT CONSTITUTES.

In such case, the $10,000 policy having been surrendered in consideration of the issuance of the lesser policy, the mere bringing of an action on the $10,000 policy did not estop recovery on the $5,000 policy, since the larger policy was not in force, and the beneficiary could in no event have recovered thereon.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 15.]

6. ELECTION OF REMEDIES ☞3(1) — REQUISITES.

To establish the defense of estoppel by election, it must be made to appear that the plaintiff had two valid and available and inconsistent remedies, and that he undertook to pursue one.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 3.]

Higgins, J., dissenting.

Error from District Court, Tarrant County; Jas. W. Swayne, Judge.

Action by John W. Eggleston, a minor, by his guardian, against the National Life Insurance Company of the United States. Judgment for plaintiff, and defendant brings error. Affirmed. On motion for rehearing. Motion overruled.

Locke & Locke, of Dallas, for plaintiff in error. Burges & Burges, of El Paso, and Hunter, Penry & Hunter, of Ft. Worth, for defendant in error.

HARPER, C. J. This appeal is from a judgment for $6,216.78 entered upon an instructed verdict. The basis of the judgment is a life insurance policy for $5,000, interest, and attorney's fees.

Findings of Facts.

The suit was originally (May 29, 1913) instituted by appellee against the National Life Insurance Company of the United States of America, upon a policy for $10,000 and interest, damages, and attorney's fees. Afterwards, December 17, 1915, and after certain depositions were taken, which disclosed that the $10,000 policy was returned to the company and negotiations entered into to reduce to $5,000, the petition was amended alleging the completion of the negotiations and reduction of policy to $5,000. While the $10,000 policy was in force, on, to wit, January 25, 1911, a proposition to reduce the policy to $5,000 was made by the following letter:

"S. H. C.                    January 28, 1911.

"Mr. Robert D. Lay, Secretary, Chicago, Ill.— My Dear Mr. Lay: Mr. Jno. W. Eggleston, insured under policy No. 118637, premium $425.20, is desirous of having the policy reduced to $5,-000.00. I talked with Mr. Eggleston in Fort Worth a few days ago in an effort to persuade him to continue the $10,000.00 policy, even if he had to cut it up in quarterly payments, but he states that he cannot make the payments on this amount of insurance.

"On the new policy he wants to pay $50.00 when the receipt is delivered to him and $25.00 per month until the annual premium is paid. If you are willing to make the change under these conditions, I will thank you to send me such papers as may be necessary and I will take pleasure in giving the case my personal attention.          Yours truly,

          "S. H. Chiles, State Manager."

January 30, 1911, the company by letter accepted the proposition "upon surrender of the original policy and receipt of proper application for reduction duly completed by the insured and beneficiary, which application is inclosed." And the matter referred to Toy Bros., by the following letter to be closed up:

                    "Feb. 10th, 1911.

"Messrs. Toy Bros., 207 Exchange Bldg., Fort Worth, Texas—Gentlemen: I wish the senior member of your firm would please attend to the following piece of business for me:

"J. W. Eggleston, former owner of the Siebold Hotel, Fort Worth, holds policy No. 118637, $10,000.00, ordinary life, nonparticipating, with us. You remember when I was over there sometime ago, it was to see him, and he wants to reduce the contract $5,000.00. He stated he would pay $50.00 and would give notes for the balance. I inclose herein six notes of $25.00 each, one note of $12.60. Upon his paying you $50.00 cash and signing these seven notes, will make a total of $212.60, then have him deliver to you the old policy of $10,000.00 and execute the in-

closed application for reduction of insurance. If the beneficiary, Jno. W. Eggleston, Jr., is a minor, this request may be signed by a legally appointed guardian, and as you will see from the blank, before a notary public.

"I will appreciate your immediate attention to this, as the time is now fast drawing near when the first note of $25.00 will be due.

"Kindly acknowledge receipt of this, and oblige.    Yours truly,

"S. H. Chiles, State Mngr."

February 4, 1911, while the $10,000 policy was still in force, the notes and cash mentioned in the above letter were mailed to Chiles, manager of company, at Dallas, and receipt issued to Eggleston. The reduction blank was not signed at this time, but was signed March 6, 1911, and was then sent into the company at Chicago. This application was returned to the agent March 10, 1911, with the objection:

"We are compelled to return this application, because it is not properly completed. It is signed by J. W. Eggleston and also by Mrs. J. W. Eggleston, Guardian. Mrs. Eggleston should have added the words 'for John W. Eggleston, Jr., Minor.' Also, the notarial acknowledgment is not correct, as it recites that the instrument was acknowledged by John W. Eggleston and John W. Eggleston, Jr. We are therefore inclosing another form which please have completed as we have added the proper words in the blank. We hold policy awaiting return of corrected application."

J. C. Toy testified:

"I do not remember giving him (Eggleston) or any one else the proper application for reduction. I could not see him when he was in the sanitarium. * * * J. W. Eggleston was insane and an inmate of an insane asylum from March 15 to April 18, 1911. And was then taken to the state asylum, where he died."

Mrs. Julia B. Eggleston testified, without contradiction by any one:

"Mr. Toy read it (the application for reduction) to us. He pointed out where to sign the paper and told my husband to sign it and then told me to sign it. I signed it where he told me to. The word 'guardian' was not written under my name, when I signed the instrument. I did not write it there. After the paper was signed by myself and husband, Mr. Toy took it. We thought it was perfectly all right. * * * He said 'it was perfectly all right.' The original policy of $10,000 was delivered to Mr. Toy at the same time. It was after we had signed this paper and delivered the policy to Mr. Toy that he said it was all right. I never saw any other instrument sent to Mr. Toy for my husband and myself to execute, and never had any conversation with Mr. Toy regarding the reduction of the policy after I signed this paper. * * * No one ever informed us that the paper was improperly signed or executed. * * * No one ever notified me that the notes were due and demanded payment of them. Had such demand been made, I was able to pay the notes. Under the policy, the insured had the right to change beneficiary without the consent of the beneficiary named in the policy."

The amended application was not executed, and upon March 23, 1911, the notes and $50 were returned with the statement that:

"The proposition for reduction is still open, subject to furnishing the company satisfactory evidence of good health." °

Mrs. Eggleston was never appointed guardian of J. W. Eggleston, Jr., the beneficiary.

The first assignment urged is that the undisputed evidence shows that the negotiations for the $5,000 policy were abandoned before completion, no policy issued; therefore judgment should have been rendered for defendant company.

[1] The facts do not sustain the charge that the negotiations were abandoned. The insured made his application for reduction of policy. It was communicated by the Texas manager to the company at Chicago. It was accepted upon the condition that the original policy be surrendered and "upon receipt of proper application for reduction duly completed by the insured and beneficiary, which application was inclosed." This application was forwarded to Toy Bros., as indicated by letter February 10, 1911.

The evidence is uncontradicted that this application was executed in the presence of Toy, that the $50 cash was paid and notes executed, and receipted for, to cover the first year's premium.

[2] If the formal application sent in was not executed exactly as suggested by the state manager, it could in no sense be an abandonment of the contract. The company's agent Toy attended to its formal execution; both he and the Egglestons evidently thought it complied with the demands of the company. That the amended application was not signed is in effect an abandonment of the negotiations for a policy as urged by appellants is without merit, we think, for the reason that it was not communicated to the insured. In other words, the insured had no notice that the original application as executed was not in compliance with the conditions imposed by the company. Again, the mere fact that there was no guardian of the minor beneficiary in the $10,000 policy to sign the application for reduction policy could in no way militate against a closed contract, for the reason that the insured could abandon the policy at any time by failing or refusing to pay the annual premium; the policy being "ordinary life, nonparticipating."

But one of appellant's propositions is that the company had the right to condition the issuance of the reduced policy in any way it chose, and, if the condition imposed were not met, there could be no binding agreement. In the first place, there is no direct evidence in the record that the conditions contained in the letters to the agents were ever communicated to the insured, unless it be that the application contained the word "guardian," under the signature of Mrs. Eggleston, and this she denies.

But, if they were, it is evident that they thought they had complied with them. This application, as appears by the letters, was obtained by Toy. He considered it all right. From him it went to Chiles, state manager, and thence to the general offices of the company at Chicago, and, before any one interested knew of any objections to the application,

the insured became insane, and in the meantime the days of grace in which to pay the January premium on the $10,000 policy had expired.

The question is: Did the parties agree upon the reduction policy?

In Eames v. Home Ins. Co., 94 U. S. 621, 24 L. Ed. 298:

"If parties could not be made secure until all the formal documents where executed and delivered, especially where the insurance company is situated in a different state, the beneficial effect of this benign contract of insurance would often be defeated and rendered unavailable."

[3] The parties had agreed upon all the conditions and terms of the contract. If Eggleston failed to execute the formal application exactly as expected by the company, the fact that he signed and acknowledged it, with his wife, as he and the company's agent Toy understood was sufficient, is proof positive that he had agreed to all the terms.

"Such contracts as these must be sustained, else the parties can have no benefit of them during that incipient period when the papers are being perfected and transmitted. It is sufficient if one party proposes to be insured, and the other party agrees to insure, and the subject, the period, the amount, and the rate of insurance is ascertained or understood, and the premium paid if demanded." Eames v. Home Ins. Co., supra.

All these things clearly existed, and there is not one fact which indicates an intention to abandon.

[4] The second assignment is that the failure to pay or tender payment of the premium notes forfeited or canceled the contract. The original policy contained a clause providing for such forfeiture, and the application for the reduction contained the provisions that the conditions of the policy are to remain unchanged except for the reduction in amount. It is admitted that no tender of payment of the notes was made. So, if the company is not estopped by its subsequent acts as contended by appellee, it has presented a good defense to a recovery.

The rule is that, when either party to a contract gives notice to the other that he will not comply with its terms, the other need not in action thereon allege or prove tender of performance. Brown v. Binz, 50 S. W. 483; Gray v. Smith, 83 Fed. 824, 28 C. C. A. 168.

The appellant, in its answer, alleged that it did not demand payment of the premium notes because they were not accepted by the company. The company had not issued its policy, and had not communicated its reason why, to the insured, up to the time he became insane. He therefore had the right to presume that, in the absence of an acceptance of his application and issuance of policy, tender of the amount of the notes was unnecessary.

On March 2, 1911, the plaintiff in error wrote its general agent at Dallas the following letter:

"Chicago, March 2, 1911.

"S. H. Chiles, Mngr., 209 Praetorian Bldg., Dallas, Texas—Dear sir: In re 118637—J. W. Eggleston. In further reference to your communication of the 15th ult., I beg to say that it is essential that the matter of reduction of the above policy have immediate attention, and you are requested to advise Mr. Eggleston accordingly. While it is true that the company has $50.00 in cash and his notes aggregating $162.50, these items are held subject to his order, awaiting the completion of the transaction, which should have had much earlier attention.

"Now, unless the application accompanied by the policy is received within the next ten days, we shall be obliged to return the notes and our check for $50.00. I trust, however, that it will be unnecessary for us to do this, and I hope that you will be able to have the transaction completed before that time.

"Very truly yours,    C. M. Currie,
                    "Assistant Secretary."

The above letter and other facts in the record disclose that, if tender had been made, it would have been rejected. The company declared no forfeiture, but before this suit, and by its answer herein, declares that there is no liability because the reduction contract was never consummated. Under such circumstances as revealed by this record, we think the insured was excused from tender of payment.

Third assignment:

"The court erred in rendering judgment in favor of the plaintiff, for that the undisputed evidence showed that the defendant originally insured the life of John W. Eggleston in the sum of $10,000 by a policy dated January 17, 1910, and that in February and March, 1911, negotiations took place looking to the surrender of said policy and the issuance in lieu thereof of a policy of $5,000, and that if thereafter there was a contract of insurance between said parties for $5,000 there was none for $10,000, and if there was one for $10,000 there was none for $5,000. And, further, the undisputed evidence showed that more than a year after the death of the said John W. Eggleston, to wit, on May 29, 1913, the plaintiff sued upon said original policy of $10,000, averring in substance that the same was still in force at the time of the death of John W. Eggleston, and that said negotiations for reduction thereof never had been completed. And thereby plaintiff elected to claim under said original policy of $10,000 and not to claim under the negotiations for reduction thereof to $5,000. And the evidence further showed, without dispute, that the plaintiff abided by such election until, to wit, December 17, 1914 (misprint for 1915), when his amended original petition was filed, in which he sought to recover upon insurance in the sum of $5,000, claiming that the negotiations for the issuance of policy in that sum in lieu of the original policy of $10,000 had been completed and merged in a valid contract of insurance before the death of said John W. Eggleston."

[5, 6] This is without merit, because the plaintiff had no cause of action upon the $10,000 policy. It had been returned to the company for cancellation as a part of the consideration for the issuance of the reduction policy and had been forfeited for failure to pay premium. To establish the defense of estoppel by election, it must be made to appear that the plaintiff had two valid and available and inconsistent remedies and that

he undertook to pursue one. Bandy v. Cates, 44 Tex. Civ. App. 38, 97 S. W. 711.

Finding no error in the record, the assignments are overruled, and cause affirmed.

HIGGINS, J. (dissenting). This is an action to recover upon a policy of insurance in the sum of $5,000, which plaintiff, appellee, claims the defendant, appellant, was obligated to issue upon the life of his father, John W. Eggleston, and in his favor, in lieu of a policy of $10,000 theretofore issued. Judgment in favor of the plaintiff for the amount of the policy, with interest, attorney's fees, and damages was rendered upon a directed verdict.

The first assignment of error reads:

"The court erred in rendering judgment in favor of the plaintiff, for that the undisputed evidence showed that no policy of insurance in the sum of $5,000 upon the life of John W. Eggleston ever had been issued by the defendant, and that the negotiations for such policy were abandoned before completion, and that no contract for insurance in the sum of $5,000 ever became effective."

The material facts in the case, pertinent to a consideration of this assignment, are as follows: Under date of January 17, 1910, the defendant issued to John W. Eggleston its policy of insurance, No. 118637, in the sum of $10,000 upon his life in favor of his son, John W. Eggleston, Jr., the plaintiff herein. The beneficiary was a minor. The policy provided that the first premium of $425.20 was the premium for one year's term insurance, ending January 17, 1911, and that, after the expiration of such year of term insurance, the policy would be continued as a policy of insurance for the whole life upon the payment of a premium of $425.20 on or before January 17, 1911, and annually thereafter on or before the 17th day of each January, so long as the policy should be in force. The insured was given the right to pay the premiums in semiannual installments or quarterly installments at his option, instead of paying them annually as primarily provided. A grace period of one month was allowed for the payment of each premium after the first during which month the insurance should continue in force. The insurance was conditioned upon the prompt payment of all premiums when due, and it was expressly stipulated that failure to pay any premium or any part thereof when due or to pay, at maturity, any note given for any premium or any part of a premium, should forfeit and cancel the contract and terminate all obligations on the part of the company under the policy, except as therein otherwise provided. There was no contrary provision, except a clause reading as follows:

"This policy may be reinstated at any time within one year from date of default of payment of premium when due, on written application therefor, subject to evidence of insurability satisfactory to the company, by the payment of premiums to date of reinstatement, with interest at the rate of 5 per cent. per annum."

The policy contained no provisions of any kind relative to its exchange for another policy of less amount. It was payable to John W. Eggleston, Jr., if living, and, if not living, then to the insured's executors, administrators, or assigns, or to such other beneficiaries as might be designated by the insured as in the policy provided. The policy provided that the insured should have the right, if the policy was not then assigned, to change the beneficiary at any time during its continuance in accordance with the rules of the company, by filing with the company a written request therefor; such action to take effect upon the indorsement of the same upon the policy by the company. Neither the annual premium due January 17, 1911, nor any semiannual or quarterly installment thereof, was ever paid. Instead of paying the premium on the policy, the insured instituted negotiations for its surrender and the issuance of a new policy of $5,000 in its stead. These negotiations took place chiefly through correspondence.

S. H. Chiles, of Dallas, Tex., was state agent for defendant, and on January 25, 1911, the insured wrote Mr. Chiles, requesting that his representative call on him as he desired to see him in regard to the policy. It seems that, very shortly thereafter, Mr. Chiles conferred with Mr. Eggleston, personally, in Ft. Worth, for on January 28, 1911, Mr. Chiles wrote to the secretary of the defendant at Chicago advising that Mr. Eggleston desired to have the policy reduced to $5,000 and indicated the manner in which the insured desired to make the payment of the premium on the new policy. Chiles requested the secretary, if he was willing to make the change, to send the necessary papers and he would give the matter attention. On January 30, 1911, the assistant secretary of defendant advised Chiles that defendant was willing to reduce the policy "upon surrender of the original policy and receipt of proper application for reduction duly completed by the insured and beneficiary, which application is herein inclosed. The settlement of premium suggested by you is entirely satisfactory to the company, and I inclose you herewith six notes of $25.00 each and one of $12.60, to which obtain signature, collect the $50.00 referred to in your communication, when the matter will have our further consideration." On February 10th, Chiles forwarded the application for reduction of policy and the premium notes to Toy Bros., at Ft. Worth, subagents of Chiles, with request that they close the matter up with the insured. In this letter to Toy Bros., they were instructed to collect the cash which was to be paid by the insured, viz. $50, and have him to sign the premium notes and deliver the old policy of $10,000 and execute the application for reduction of insurance. They were further advised that if the beneficiary, John W. Eggleston, Jr.,

was a minor, the request must be signed by a legally appointed guardian before a notary public. On February 14, 1911, Toy Bros. forwarded to Chiles check for $50 and the seven notes to cover the premiums and advised that Eggleston would deliver the old policy and reduction slip that afternoon, which would be promptly forwarded upon its receipt. Eggleston failed to deliver the old policy and execute the reduction slip for some time thereafter, and on March 2d the assistant secretary of the company wrote to Chiles that it was essential that the matter of reduction of the policy have immediate attention and that Eggleston be advised accordingly, and that unless the application, accompanied by the policy, was received within the next 10 days, the notes and cash payment of $50 would be returned. On March 4th, Chiles again wrote Toy Bros., requesting that they get the insured to close the matter up at once. About March 6th, the insured delivered to Toy Bros. the old policy, together with the reduction application, and the same was forwarded to Chiles. The signed reduction application is as follows:

"Application for Reduction of Insurance.
"To the National Life Insurance Company of the U. S. of A., Chicago, Ill.
"Application is hereby made for the reduction of the insurance under policy No. 118637 upon the life of John W. Eggleston, from $10,000.00 to $5,000.00, such reduction to date from January 17, 1911.
"The conditions of the policy are to remain unchanged except for this modification.
"Dated at Ft. Worth, Texas, this 6th day of March, 1911. [Signed] J. W. Eggleston, Insured. [Signed] Mrs. J. B. Eggleston, Guardian, Beneficiary or Assignee.
"Witness: [Signed] J. C. Toy.
"To be signed by the person on whose life the policy is written and by the beneficiary or assignee. If the beneficiary or assignee is a minor, the above request must be signed by a legally appointed guardian.
"State of Texas. County of Tarrant—ss:
"On this 6th day of March, in the year of our Lord, 1911, before me personally came John W. Eggleston and John W. Eggleston, Jr., to me known to be the individuals described in and who executed the foregoing assignment and acknowledged that they executed the same for the purposes therein mentioned. J. E. Eggleston, Notary Public Tarrant County, Texas."

The old policy and application for reduction was promptly forwarded by Chiles to the assistant secretary at Chicago, and on March 10th same was returned to Chiles with the following letter:

"We are compelled to return this application, as, you will observe, it is not properly completed. It is signed by J. W. Eggleston and also by Mrs. J. B. Eggleston, Guardian. Mrs. Eggleston should have added the words 'for John W. Eggleston, Jr., Minor.' Also the notarial acknowledgment is not correct, as it recites that the instrument was acknowledged by John W. Eggleston and John W. Eggleston, Jr. We are, therefore, inclosing another form, which please have completed, as we have added the proper words in the blank.
"We will hold the policy awaiting return of corrected application."

On March 13th, Chiles returned the application for reduction to Toy Bros., for correction in the particulars indicated in the previous letter; and, the papers not being corrected and returned, the assistant secretary of the company on March 20th returned to Chiles the premium notes with instructions to return same to the insured and refund the $50 cash payment. In this letter it was stated that:

"The proposition for reduction or renewal of the policy is still open, subject to his furnishing the company satisfactory evidence of good health."

On March 23d, Chiles wrote Eggleston, advising that, since the application sent in was not properly signed and had not been returned in corrected form, he was instructed to return the notes and cash payment, which he did.

The beneficiary had no legal guardian. Mrs. J. B. Eggleston, who signed same as his guardian, was his mother. J. B. Eggleston became insane while the negotiations were pending, and the corrected application blank signed by him and a legally appointed guardian of the beneficiary was never returned to the defendant.

The legal effect of Eggleston's negotiations for a reduction of the policy was an application for a new contract of insurance in the sum of $5,000, to which his old contract gave him no right. There was no mention whatever in the old policy of any such matter as a modification of the contract by reducing the amount of insurance and the amount of premiums payable. If anything of this kind were desired, it would have to be accomplished by the making of a new contract entirely independent of the old, or by the making of a new contract which could be ingrafted upon the old as an amendment thereof. An amendment of a contract is, in itself, a contract, to which are essential all of the elements required in any other contract. From the amendment there results a new and substituted contract, consisting of the amendment and the retained portions of the old contract. Hence, if the minds of the parties do not meet on the amendment, the new contract contemplated by the modification does not become effective. As summarily stated by Mr. Page in section 1341 of his book on Contracts:

"The proposition that a prior contract may be modified or abrogated by a subsequent contract implies that such subsequent contract must have the elements necessary to the formation of a valid original contract."

I take it that it is well settled that, since the company was under no legal obligation to insure Eggleston's life for $5,000 or to issue a new policy for that amount in lieu of the old one, the company had the right to condition in any way it chose its consent to do so, and, if the condition imposed by it was not made, there would be no binding agreement. Bishop on Contracts (2d Ed.) §§ 321, 323; Clark on Contracts (3d Ed.) § 21; 1 Page on

Contracts, § 48; Eliason v. Henshaw, 4 Wheat. 225, 4 L. Ed. 556; Minneapolis & St. Louis Ry. Co. v. Columbus Rolling Mill, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376; Flomerfelt v. Hume, 11 Tex. Civ. App. 30, 31 S. W. 679; Jackson v. Butler, 21 Tex. Civ. App. 379, 51 S. W. 1095; Washington v. Rosario Mining & Milling Co., 28 Tex. Civ. App. 430, 67 S. W. 459; Simpson v. Alexander, 149 S. W. 748; Wiswell v. Bresnahan, 84 Me. 397, 24 Atl. 885; McCormick v. Bonfils, 9 Okl. 605, 60 Pac. 296; New York Life Ins. Co. v. Ireland, 17 S. W. 617, 14 L. R. A. 278.

As a condition of its obligation to issue the $5,000 policy, the company had stipulated that the application for said reduction should be signed by the insured and the legally appointed guardian of the minor beneficiary of the old policy. This stipulation was plainly disclosed by the clause appearing upon the face of the application immediately below the place for signature and which reads: .

"If the beneficiary or assignee is a minor, the above request must be signed by a legally appointed guardian."

It is an admitted fact that no such application was signed and delivered by any such legally appointed guardian. This, in my judgment, absolutely precludes a recovery, unless the company waived the condition so imposed by an agent authorized to make such waiver. I think there is nothing in the evidence to show such a situation. The company, itself, at all times insisted upon such condition. If there was a waiver, it must have been made by the agents, Chiles or Toy. A "waiver" is a voluntary relinquishment of a known right. Mrs. Eggleston testified that the agent Toy came to the house where she and her husband were, and procured them to sign the application for reduction. She said:

"He took the paper out of his pocket. I got tho ink, and Mr. Eggleston and I signed the paper. I don't know that I read the paper all through. I glanced over it. I think my husband read it. Mr. Toy read it all to us. He pointed out where to sign the paper and told my husband to sign it, and then told me to sign it. I signed it where he told me to. The word 'guardian' was not written under my name when I signed the instrument. I did not write it there. After the paper was signed by myself and my husband, Mr. Toy took it. We thought it was perfectly all right."

Continuing over the defendant's objection and duly reserved exception, she testified, in answer to a question as to what Mr. Toy said after the paper had been signed: "He said it was perfectly all right." Since the instrument, upon its face, disclosed that if the beneficiary was a minor it must be signed by a legally appointed guardian, it thus was made known to both Mr. Eggleston and his wife by their reading of the instrument and by Mr. Toy's reading it all to them that it was to be signed by a legally appointed guardian of the minor beneficiary. No deception is claimed to have been practiced. The only thing claimed is that, after the instru-

ment had been signed, Mr. Toy said it was "perfectly all right."

Mr. Toy testified that he understood Mrs. Eggleston to be the legal guardian of the beneficiary, and that Mr. and Mrs. Eggleston had stated to him that she was such guardian, and that this was the only information he had on the subject, except that the instrument itself showed that she was his guardian. Mrs. Eggleston, testifying from the stand not only after this deposition had been filed but after it had been read in evidence, did not deny that she told Toy that she was the legal guardian of her son. Toy's testimony on this subject was uncontradicted, except that part of it which says that the application for reduction itself showed on its face that she was such guardian. She contradicts that statement by saying that she did not write in the word "guardian" appearing as a part of her signature, and that it was not written there at the time that she signed the paper. As to this particular matter, her statement stands against the statement of Mr. Toy and the appearance of the instrument itself.

If Mrs. Eggleston had been in fact the legally appointed guardian for her son, and if Toy had had authority to waive the irregularities in her signature and the acknowledgment pointed out by the company in letter of March 10th to Chiles, above quoted, possibly the court might be justified in holding that what he did and said amounted to a waiver of such irregularities. Certainly he did not do anything which by any possibility could be construed as a waiver of the fact, unknown to him, that Mrs. Eggleston's signature was not that of a legally appointed guardian.

As to Mr. Chiles, it is not claimed that he did anything in the way of waiver, except that by letter of March 7th he transmitted the old policy and application for reduction to the company with the statement that the application was "duly completed." This was a communication between Mr. Chiles and the company, not between Mr. Chiles and the insured or beneficiary; it was not known to the insured or beneficiary, and consequently did not affect them in any way; and it was merely a chance expression outside the scope of Mr. Chiles' functions, and made without consideration upon his part, and made also without any knowledge upon his part that Mrs. Eggleston was not in fact the guardian of John W. Eggleston, Jr. In the one conversation which Mr. Chiles had with Mr. Eggleston regarding the matter of reducing his insurance, he informed Mr. Eggleston that he would submit the matter to the company; which, of course, was equivalent to informing him that the company, and not Chiles, would pass upon the questions involved. The facts detailed above are insufficient to show a waiver upon the part of Toy. But, if it could be construed as a

waiver upon his part, he was without express authority to make same, and, in the absence of express authority, there must have been such a holding out upon the part of the defendant as would estop it from questioning his authority. The evidence, by means of which plaintiff endeavors to escape the effect of an entire absence of authority upon the part of the agents Chiles and Toy to modify in any way the company's requirement that the application for reduction of insurance be signed by the legally appointed guardian of the minor beneficiary, is the following testimony given by Mrs. Eggleston:

"I never at any time saw any of the letters or copies of letters from Mr. Currie or Mr. Stebbins (secretary and general counsel respectively of defendant) or Mr. Chiles. I never have seen the originals or copies of letters passing between Mr. Chiles and Mr. Toy with respect to my husband's policy. I never have seen any letters passing between any of the officers or agents of the defendant company restricting any authority that they had, or with regard to any matter concerning the business. I never have seen or been made familiar with any of the rules or regulations or any of the company's laws governing the authority of local agents, general agents, or special agents or officers of the company. They have never been communicated to me in any way. I do not know whether any of these letters or rules or regulations of the company were ever communicated to my husband."

This is insufficient. A principal is bound only by such acts of his agent as are within the real authority of the agent or within such authority as the principal, by his own word or act, has caused the agent to appear to have, in the eyes of one dealing with him prudently and sensibly. One cannot shut his eyes and deal with an agent on the assumption that he has unlimited authority, and then hold bound a principal who did not in fact or in appearance confer said authority. On the contrary, it is the duty of every one who deals with one assuming to act as an agent to ascertain both the fact and the extent of the agency. It is only after having used reasonable diligence to discover a want of authority and having failed to do so, by reason of acts or words traceable directly to the principal, that one is entitled to avail himself of the rule that secret limitations upon authority apparently conferred will not protect a principal against one dealing with his agent in good faith. It is a matter of estoppel.

In this case, we are not dealing with secret instructions contravening general authority, actually or apparently conferred. There was no general authority covering the transaction. The special authority consisted of a letter transmitting to Chiles (and by him in turn transmitted to Toy Bros.) a blank application to be duly executed in accordance with its terms. The requirement that the application be executed by a legal guardian of the beneficiary of the old policy was made upon this blank. This blank was read by Mr. Eggleston and by Mrs. Eggleston and was read over to them both by the agent, Toy. Nothing was said or done by any person derogating in any way from the effect of this requirement plainly printed on the blank itself. After it was executed, the agent Toy, who supposed that Mrs. Eggleston was in fact the legal guardian of the beneficiary, told her it was all right. It cannot be said that Mr. and Mrs. Eggleston were acting with reasonable prudence in relying upon this statement, and assuming that the agent had authority to waive an express requirement of his principal, when the principal had done nothing to indicate that he had such authority, but everything to put them upon notice that he had not. Especially is this true when they knew, and knew that he did not know, that Mrs. Eggleston was not the legally appointed guardian of John W. Eggleston, Jr., and knew that he could mean nothing more by such a statement than that, being such legal guardian, she had signed the instrument in a sufficient manner.

I am of the opinion that, the condition imposed by the company not having been either complied with or waived, the negotiations for a reduction of the amount of the policy and the issuance of a new one in lieu of the old one never ripened into a contract, and the company never became bound as an insurer for $5,000.

There is no contention that the company is liable upon the original policy, and I am of the opinion that the judgment should be reversed and here rendered for appellant.

### On Rehearing.

HARPER, C. J. In its motion for rehearing and for additional findings of fact, plaintiff in error calls our attention to an error in copying the letter of February 10th from Chiles to Toy Bros. The letter is copied as stating, "this request *may* be signed by a legally appointed guardian," when the verbiage of the letter is, "the request *must* be signed by a legally appointed guardian." We make the correction as suggested, so as to show the use of the word "must" instead of "may." A correction in the statement of facts giving the date of the letter from Toy to Chiles inclosing the check for $50 and the seven notes is made. The date of the letter is February 14, 1911, instead of February 4th, as in the statement. This last error evidently resulted from an error in the letter from Chiles to Toy of February 15th, in which he says: "I have your favor of the 4th inst., inclosing check, etc."

Plaintiff in error requests that this court find as a fact that, as a condition to its reducing its outstanding contract of insurance, the company required that a written application for such reduction be submitted to it and the terms of it. The letter is referred to in the opinion as of January 30th and a portion only of it copied. We here copy the letter in full:

"January 30th, 1911.

"Mr. S. H. Chiles, Manager, 209 Praetorian Bldg., Dallas, Texas—Dear Sir: In re 118637. J. W. Eggleston. In response to yours of the 28th, I beg to say that we will be pleased to reduce the above policy from $10,000.00 to $5,000.-00 upon surrender of the original policy and receipt of proper application ·for reduction duly completed by the insured and beneficiary, which application is herein inclosed. The settlement of premium suggested by you is entirely satisfactory to the company, and I inclose you herein six notes of $25.00 each and one of $12.60, to which obtain signature, collect the $50.00 referred to in your communication, when the matter will have our further consideration. Thanking you for your attention to this matter, I am, with kind regards,

"Very truly yours,    C. M. Currie,
"CMC/MAN.    Assistant Secretary."

The letter of February 10, 1911, from Chiles to Toy Bros., copied in the opinion, shows the further action of the company.

Plaintiff in error requests this court to find as a fact that prior to the execution of the application for reduction of insurance Eggleston and wife had informed Toy that Mrs. Eggleston was the legally appointed guardian of the beneficiary, John W. Eggleston, Jr., and that Toy had no information to the contrary. The evidence is not clear on the fact requested.· We state the evidence: J. C. Toy said:

"The only information I had as to whether or not Mrs. Eggleston was the legally appointed guardian of J. W. Eggleston, Jr., was the statement of Mr. Eggleston and Mrs. Eggleston that such was the case. They stated to me that she was his guardian."

At the request of appellant, we further find as a fact that the company never appropriated to its own use the money and the seven notes delivered by Eggleston to Toy for the purpose of paying the premium on the reduced insurance, but held same in suspense until March 20, 1911, when Currie sent the cash and notes to Chiles to be delivered to Eggleston; Chiles, through Toy, returned them to Eggleston March 25, 1911; the money and notes were returned to the company, when the company again sent them back to a bank at Ft. Worth to be delivered to Eggleston or any one representing him; and on May 29, 1911, Mrs. Eggleston, then the appointed guardian of Mr. Eggleston, accepted from the bank the money and notes. A question is raised by the appellee as to whether Mrs. Eggleston, without an order of court, could accept the money and notes; Eggleston then being insane.

We are requested to make other findings of fact, but we think the record would hardly justify the requested findings, and for that reason we have not done so. The original opinion expressed the disposition we think should be made of the case, and the motion for a rehearing is overruled.

HIGGINS, J. (dissenting). For the reasons indicated in the dissenting opinion heretofore filed by me, I think this case should be reversed and rendered in favor of the plaintiff in error. I therefore dissent from the order overruling the motion for rehearing.

Additional Finding of Fact.

HARPER, C. J. Upon the motion of the defendant in error, the court makes the following additional finding of fact:

"*Change of Beneficiary.* The insured herein reserves and is hereby granted the right, provided this policy is not then assigned, to change the beneficiary or beneficiaries at any time during the continuance of the same, in accordance with the rules of the company, by filing with the company written request to such effect, such change to take effect upon indorsement of the same upon the policy by the company."