## GODFREY et al. v. CENTRAL STATE BANK OF ABILENE. (No. 390.)

Court of Civil Appeals of Texas. Eastland.
Jan. 27, 1928.

Rehearing Denied April 13, 1928.

1. **Contracts** ⬳23—**Acceptance of offer must be unconditional.**

To constitute a binding acceptance of an offer, acceptance must be unconditional.

2. **Contracts** ⬳24—**Variation suggested in acceptance becomes new offer requiring acceptance.**

If acceptance of an offer suggests an alteration or variation, it amounts to a rejection of the old offer, and becomes, in effect, a new offer, which in turn must be accepted to be binding.

3. **Contracts** ⬳29—**Question of correspondence constituting contract is for court.**

Whether correspondence constitutes a contract is a question of law for the court.

4. **Contracts** ⬳32—**Formal contract is necessary, where it is understood terms, when settled, are to be determined by formal contract.**

If all the terms of an agreement have not been settled, and it is understood that these settled terms are to be determined by a formal contract, there is no binding obligation till the formal contract is executed.

5. **Contracts** ⬳24—**Acceptance varying from offer ends negotiations, unless party renews original offer, or assents to suggested modification.**

An acceptance on terms varying from offer is a rejection of the offer, and puts an end to negotiations, unless party making original offer renews it, or assents to modification suggested; the party so rejecting the offer cannot afterwards revive it by tendering an acceptance of it.

6. **Mines and minerals** ⬳79(1)—**Under correspondence for purchase of oil royalty rights in land, condition of offer that deeds be sent with drafts attached held acceded to.**

Condition of plaintiff's offer to buy oil rights in lands that deeds inclosed be returned, after being executed, with drafts attached, *held* acceded to, where defendant sent them back, saying that he had made a little change therein, and, if this was satisfactory to plaintiff, he should return them, and defendant would execute them and send them to plaintiff with all necessary papers; and, if the changes were not satisfactory to plaintiff, he should note such changes as would be satisfactory and return deeds to defendant, and defendant would try to adjust the matter satisfactory to both of them; and, if the change made by defendant was not satisfactory

to plaintiff, defendant would be glad to handle in the way outlined; and plaintiff objected to changes and rewrote deeds.

**7. Mines and minerals ⊜⟝79(1)—Correspondence for purchase of oil royalty rights in land held to contain agreement to furnish abstract showing good and merchantable title.**

Correspondence between the parties for purchase of oil royalty rights in land, considered as a whole, and in view of defendant's final acceding to suggestions of plaintiff and agreeing "to handle in way outlined" by plaintiff, *held,* to contain agreement to furnish abstract showing good and merchantable title.

**8. Mines and minerals ⊜⟝79(1)—Correspondence for purchase of oil royalty rights held not to show intention that deed should constitute contract and that there should be no trade till deed was agreed on.**

The correspondence for purchase of oil royalty rights in lands *held,* not to show intention of the parties that the deed should constitute the contract between them, so that there should be no trade till there was agreement on the deed.

**9. Frauds, statute of ⊜⟝116(3, 4)—Authority of agent to buy interest in land need not be in writing.**

That contract of agent for purchase of land shall bind his principal, his authority need not be in writing, under statute of frauds.

**10. Frauds, statute of ⊜⟝116(1, 2)—Statute is satisfied by contract for purchase of land in agent's name.**

Statute of frauds is satisfied, if contract for purchase of land be in agent's name, so that contract need not be confirmed by principal.

**11. Frauds, statute of ⊜⟝116(3, 4)—Agent's authority to purchase land is provable by parol.**

Authority of agent to contract for purchase of interest in land may be proved by parol.

**12. Specific performance ⊜⟝32(3)—Obligations by promise of contract for sale of oil rights held mutual, authorizing specific performance.**

The obligations of a contract for sale of oil rights in land *held,* mutual, as is necessary for specific performance, where no consideration moved except merely a promise for a promise.

**13. Mines and minerals ⊜⟝79(1)—Counter offer of G. that he buy half of interest in oil royalty right offered and another the other half held accepted by reply.**

Defendant, who had offered to sell to plaintiff G. an interest in oil rights *held,* by his reply, agreeing to handle "in the way outlined" by G., to have accepted G.'s counter offer that the sale be to him of half of the interest and to plaintiff E., for whom G. was agent, of the other half interest, making the contract enforceable, on that basis.

**14. Mines and minerals ⊜⟝79(1)—Royalty and mineral rights held used with same meaning in negotiations for sale of oil and gas royalty rights.**

The correspondence between the parties negotiating for sale of oil and gas rights in land,

as well as their course of negotiations in a previous sale *held,* to show that in the use of the terms "royalty" and "mineral rights" the parties had in mind the same subject-matter.

**15. Pleading ⊜⟝291(2)—Verification is necessary to raise issue of execution of instrument or authority of agent signing it (Rev. St. 1925, art. 2010).**

Under Rev. St. 1925, art. 2010, verification of plea is necessary to raise issue of execution of the instrument sued on or authority of the agent by whom it is alleged to have been executed.

**16. Mines and minerals ⊜⟝79(1)—Correspondence relative to purchase of oil and gas royalty rights held to constitute binding agreement.**

The correspondence relative to purchase of oil and gas rights in lands *held,* to constitute an agreement binding the parties.

**17. Principal and agent ⊜⟝24—Issue of agency is for jury, testimony in support being oral, and coming from interested parties.**

The issue of agency is for the jury, the testimony in support of such agency resting in parol and coming wholly from interested parties, the jury being entitled to believe or disbelieve the parties in the exercise of its prerogative in judging credibility of the witnesses and the weight to be given the testimony.

Funderburk, J., dissenting on rehearing.

Error from District Court, Taylor County; M. S. Long, Judge.

Action by P. S. Godfrey and another against the Central State Bank of Abilene. Judgment on verdict directed for defendant, and plaintiffs bring error. Reversed and remanded.

Goggans & Allison, of Breckenridge, Davidson & Hickman, of Abilene, and Clint & Eades, of Dallas, for plaintiffs in error.

Scarborough & Wilson, of Abilene, and Grisham Bros., of Eastland, for defendant in error.

LESLIE, J. This suit is to enforce specific performance of an alleged contract to convey certain oil and gas rights in lands situated in Winkler county, Tex. The contract relied on is evidenced by a series of letters passed between President Hutchison of the Central State Bank of Abilene, Tex., defendant below, and the plaintiff Godfrey. In this opinion the parties will be designated as below, plaintiffs and defendant. The defendant bank contends that the correspondence amounts to nothing more than negotiations to sell and purchase, and not a consummated or concluded agreement to that effect.

At the conclusion of the trial, each party asked an instructed verdict, and the court directed one in favor of defendant bank. To this action of the court there are seven assignments of error. Two main questions are

---

⊜⟝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

before this court: (1) Did the trial court correctly construe the correspondence or documentary testimony? and (2) does the testimony otherwise raise an issue of fact that should have gone to the jury?

Previous to this transaction, plaintiff Godfrey had purchased from said bank royalty on an undivided one-half interest in section 41. Following that deal, the president of said bank wrote Godfrey that he had for sale other royalties in that vicinity. This was the beginning of the negotiations which terminated in this lawsuit. Since the appeal necessarily turns upon the construction given the correspondence passing between the litigants, that correspondence will be set out in full. It is as follows:

"Abilene, Tex., May 18, 1926.

"Mr. P. S. Godfrey, Mercantile National Bank Bldg., Dallas, Tex.—Dear Sir: Replying to your letter of the 13th in which you inclose oil and gas lease on the Southwest ¼ of section No. 38 which you agree to lease at the rate of $1.25 per acre will say that between the time that I wrote you and received your letter, I sold the three sections we have been mentioning, namely, 23–25 and 38, in fee and therefore will not be able to deliver to you this lease unless for some reason this deal fails to mature and I do not think it will. I am sorry that I did not receive your letter before I closed this deal with the other party, however I still have plenty of royalty in the other six sections which are nearer the well, same being sections 34–35–40–41–45 and 46, that I could sell you which in many instances is better to buy than lease from the fact that it does not run out as a lease does. If you could use the royalty in any of these sections, I will be glad to name you a price which will run a little cheaper than section No. 41 that you bought on account of it being further away from the well.

"Let me hear from you regarding this matter that I may be able to sell you some royalty in these sections.

"Assuring you that I regret very much having sold the lease before receiving your letter and trust that I may be able to sell you some of the royalty, I am,

"Yours truly,           C. T. Hutchison.

"P. S.—Would have written you sooner but I have been tied up in court."

"Dallas, Tex., May 27, 1926.

"Mr. C. T. Hutchison, % Central State Bank, Abilene, Tex.—Dear Sir: Replying to your favor of May 18th, advising that you had sold the three sections, part of one of which I was desirous of leasing but that you will quote me a cheaper price on the royalty in sections 34, 35, 40, 45 and 46 than I paid on section 41 by reason of their being farther away from the well.

"You, no doubt, know that this well is at present drilling below 1,300 feet and has not had a showing of either gas or oil, so that a man purchasing royalties at this time would not expect to pay as much as when the well was first spudded, as he has lost the play on the first 1,300 feet and his chances are now narrowed down to balance of the depth of the well; and usually a well that has any deep oil makes some showing at a shallow depth of either oil or gas. However, if your price is enough

cheaper than that I paid on section 41 to interest me, I might purchase some more royalty from you and would, therefore, suggest that you quote me a price on a one-sixteenth royalty on Section 34; also, on Sections 46 and 35, same to be sold upon you furnishing complete abstract showing good and marketable title in the Central State Bank.

"Kindly let me hear from you promptly on this matter, and oblige.

"Very truly yours,        P. S. Godfrey.
"PSG—LC"

"Abilene, Tex., May 29, 1926.

"Mr. P. S. Godfrey, Mercantile Nat. Bank Bldg., Dallas, Tex.—Dear Sir: Referring to your letter of May 27th, in which you state that you would be interested in buying one-sixteenth royalty in sections 34, 35, and 46 in Winkler county, would say that I would make you a price of three dollars per acre on the one-sixteenth royalty in the three above mentioned sections, furnishing you one complete abstract covering the three sections. If this proposition is agreeable to you, please let me hear promptly, and oblige.              Yours very truly,
"CTH:UC         C. T. Hutchison, President."

"Dallas, Tex., June 3, 1926.

"Mr. C. T. Hutchison, Central State Bank, Abilene, Tex.—Dear Sir: Replying to your favor of the 29th ult., advising that you will make me a price of $3.00 per acre on one-sixteenth royalty covering the three sections, to wit, 34, 35 and 46 in Winkler county, I suppose by this that you mean you are willing to sell this on a $3.00 basis, or a basis of $3.00 per acre for full royalty, which would be a little less than what I paid in section 41 which was on a basis of $5.00 per acre.

"My latest information on the Westbrook well shows this well to be drilling below 1,800 ft., and no showing of either oil or gas up to the present time, which, of course, does not make things look very favorable. However, if a deal could be closed immediately I would be willing to pay the sum of $650.00 for two-sixteenths of the royalty on the above three sections, and you to furnish one abstract showing good and marketable title covering the three sections. This is very little less than the price you offered to take and is taking two-sixteenths instead of one-sixteenth, so I feel that under the circumstances I would be entitled to this reduction. If you care to sell at this price please confirm by return mail, and if you desire I will then prepare contract for both parties to sign and will close the deal in the same manner as the last deal was closed.

"Trusting to hear from you by return mail, I beg to remain,        Very truly yours,
"PSG—LC                    P. S. Godfrey.

"In answering please address me at 902 Mercantile Bank Bldg., as your last letter was addressed in care of Mercantile Bank and was delivered to the bank instead of to my office, and was delayed several days in being forwarded to me."

"Abilene, Tex., June 4, 1926.

"Mr. P. S. Godfrey, 902 Mercantile National Bank Bldg., Dallas, Tex.—Dear Sir: Replying to yours of the 3d concerning the purchase of some interest in sections 34–35 and 46 in Winkler County will say that I will deliver to you two-sixteenths of one-eighth of the royalty in these three sections for $650.00. If you would prefer to

draw the contract or deed, you may do so and send same to me for my examination and will accept same if it meets with our terms. I would prefer your making the contract because it would be worded in a way that would be satisfactory to you, which I might not do in case I should prepare same.

"I will furnish you one complete abstract covering amount of royalty in the three sections which will be exactly the same as the abstract that you now hold on section 41 as this abstract covers the six sections and just certifies to for one section. I will give you a letter guaranteeing the abstract to be a duplicate of the one you have so that you may pay on this amount and which will protect you so that you may recover the amount paid for this royalty in case the abstract is not as represented. When I receive your deed and execute same and return to you, I will send you the letter at the same. You will please send this at once so that we can get this matter closed up at once.

"Yours truly,
"H–p. C. T. Hutchinson, President."

"Dallas, Tex., July 12, 1926.

"Central State Bank, Abilene, Tex. Attention: C. T. Hutchison—Dear Sir: I owe you an apology for not answering your letter of June 4th regarding the sale of two-sixteenths of the landowner's one-eighth royalty in sections 34, 35 and 46, Winkler county, Tex. This letter evidently was delivered while I was busily engaged in the trial of a case at the courthouse and was placed on my desk and got mixed up with some other papers and placed in one of the files without my having opened same, and on last Saturday on going through this file I came across this letter and opened and read it for the first time.

"I am still willing to purchase this royalty on the basis mentioned in my letter to you and in your letter to me. I have a friend here who is taking one-half of this; that is, I am buying one-sixteenth of the landowner's one-eighth royalty, and he is taking the other one-sixteenth of the landowner's one-eighth royalty, and in order to close this deal I do not think it will be necessary for us to execute any sale contract but instead I have prepared two mineral deeds, one to P. S. Godfrey and the other to T. C. Eades, each reciting a consideration of $325.00 in payment of one-sixteenth of the landowner's one-eighth royalty on these three sections, and these mineral deeds are worded exactly like the one you executed when I purchased the royalty on section 41, with the exception of the consideration of course is different and the fractional royalty being purchased is different. I inclose these two mineral deeds herewith. I notice that section 46 is in block No. 26, while sections 34 and 35 are in block B–5, and the deeds are drawn that way.

"You state in your letter that you will furnish one complete abstract covering the three sections which will be exactly the same as the abstract I now hold on section 41. You are in error in believing that the abstract I now hold covers all six of these sections, as quite a number of the documents set out therein, particularly all records from the General Land Office, cover only section 41, and a number of these documents set out therein cover only those sections embodied in block B–5 and do not cover section 46 which is in block No. 26.

I shall, of course, expect you to furnish me one complete abstract showing good and marketable title to sections 34 and 35 of block B–5, and section 46 in block No. 26, public school lands, Winkler county, Tex. If you will simply write me a letter guaranteeing to furnish me with complete abstract showing good and marketable title in Central State Bank to sections 34 and 35 of block B–5, and section 46 in block No. 26, and then attach this letter to the two mineral deeds which I inclose herewith, after you have properly executed and acknowledged said deeds for Central State Bank, and attach two drafts, each for $325.00, one upon T. C. Eades and the other upon P. S. Godfrey, and send all to the Mercantile National Bank, Dallas, Tex., subject to our examination and approval, we will as soon as we have examined the papers and found them in proper form, take up the two drafts. You can in the meantime place your order for the abstract covering the three above sections with the abstractors at Kermit and abstract can come forward later, because if the deal is to go through I agree with you it should be consummated at once, as I understand this well is now below 1,800 ft., and up to the present time it has not had any showing of either oil or gas.

"Thanking you to give the above matter your prompt attention, I beg to remain.

"Very truly yours, P. S. Godfrey.
"PSG–LC"

"Abilene, Tex., July 14, 1926.

"Mr. P. S. Godfrey, 901-2-3-4 Mercantile Bank Bldg., Dallas, Tex.—Dear Sir: I have your letter of recent date in answer to my letter of some thirty days ago concerning royalty in Winkler county land and received inclosed mineral deeds, one to yourself and one to Mr. Eades. I rewrote these deeds making a little change in the last paragraph, balance being an exact copy as yours and I am submitting them to you for your inspection, and if satisfactory, return them and I will indorse them and send to you together with all necessary papers, including abstract which you may examine and if satisfactory, will be ready to close the deal. In case the changes I have made are not satisfactory to you, please mark or write into it such changes as will be satisfactory and return to me and I will try to adjust the matter satisfactorily to both of us.

"Please pardon me for making this change as I thought it would be better and hope it will be satisfactory to you, but if not, will be glad to handle in the way outlined. Let me hear from you as soon as convenient.

"Yours truly, C. T. Hutchison,
"President."

"Dallas, Tex., July 15, 1926.

"Mr. C. T. Hutchison, Central State Bank, Abilene, Tex.—Dear Sir: Replying to your favor of the 14th inst., inclosing royalty deeds which you had prepared and substituted for the ones which I sent you a few days ago, beg to state that after examining these deeds it appears to me that they would not be satisfactory to either yourself or to me, as they do not correctly state the facts. The deeds which you prepared contain the following statement:

" 'It is expressly agreed and understood that the grantor herein has already leased this property conveyed to J. W. Grant and assigned by

him to Westbrook & Company of Fort Worth, Tex.'

"As a matter of fact the grantor herein (Central State Bank) did not lease this property to J. W. Grant but same was leased to J. W. Grant by T. G. Hendrick, and Central State Bank did not acquire the property until after original lease was made to Grant and same had been assigned by Grant to Westbrook & Company of Fort Worth.

"However, I have prepared two more deeds and have changed the paragraph regarding the leasing so that same correctly states the facts, and I inclose these two new deeds herewith; also, returning the ones which you prepared. After examining the two which I have prepared and inclose herewith, if they meet with your approval you may execute them as president of Central State Bank, being sure to have them attested to by your secretary and properly acknowledged. Then, if you will furnish me with complete abstract showing good and marketable title to this property in the Central State Bank, and will attach drafts to the deeds and forward to the Mercantile National Bank, according to instructions in my former letter, I will see that these drafts are properly taken up.

"I would like very much to close this matter up within the next week or ten days as I expect to leave town about the first of August and I may be gone two or three weeks, so will appreciate you rushing the matter all that you can.

    "Yours very truly,      P. S. Godfrey.
"PSG–LC"

    "Dallas, Tex., July 19, 1926.

"Central State Bank, Abilene, Tex. Attention: C. T. Hutchison, President.—Gentlemen: I. have just received a report that the Westbrook well had an oil showing, and if this is true it will give myself and Mr. Eades an opportunity to make an immediate profit upon a turn-over of the one-eighth royalty that we have recently purchased from you covering sections 34 and 35 of block B–5 and section 46 of block 26; so, I will thank you to wire me at once at my expense, stating just how soon you will forward the deeds and drafts to the Mercantile National Bank here, as per my instructions. I will appreciate you doing this at once, and as far as the abstracts are concerned they can be prepared and forwarded to me later, as any unnecessary delay at this time may cause us to sustain considerable monetary loss.

"If you have any objections whatever to the last deeds which I prepared and forwarded you, then you will kindly execute the first deeds I prepared and forward same with drafts attached to the Mercantile National Bank as per your agreement in your letter of July 14th.

"Kindly wire me at my expense, acknowledging receipt of this letter, and advising how soon executed deeds will be placed in the mail, and very much oblige,

    "Yours very truly,     P. S. Godfrey."

    "Abilene, Tex., July 21, 1926.

"Mr. P. S. Godfrey, 901 Mercantile Bank Bldg., Dallas, Tex.—Dear Sir: Replying to your letter of the 20th regarding the Winkler county royalties will say that I have ordered a supplement deed down to date and I am trying to check up on my royalty in these six sections. It looks like I have sold all the royalty in section 34, but I still have some royalty in sections 35 and 46 but am unable to check 34 at present but will advise you regarding same as soon as I am able to estimate how I stand on that section.

"I understand that we have an oil showing out there but I am unable to get a correct report on same. As you suggested, it might be a good thing to sell as it is always too late after the well stops producing and will advise you on this matter just as quick as I can.

    "Yours truly,
"H.–p.          C. T. Hutchison, President."

In suits for the enforcement of specific performance of a contract, certain fundamental principles of law govern, and about them there seems to be no difference of opinion upon the part of the plaintiff and defendant. For instance:

[1] (1) It is uniformly held that, to constitute a binding acceptance of an offer to sell, the acceptance must be unconditional; no new terms may be imposed; and no departure from the terms offered will be tolerated. Washington v. Rosario Mining & Milling Co., 28 Tex. Civ. App. 430, 67 S. W. 459, and authorities there cited.

[2] (2) If the acceptance of an offer suggests an alteration or variation, it amounts to a rejection of the old offer, and becomes, in effect, a new offer, which in turn must be accepted to become binding. Summer v. Mills, 21 Tex. 77; Patton v. Rucker, 29 Tex. 402; Foster v. New York Land Co., 2 Tex. Civ. App. 505, 22 S. W. 260; Brillhart v. Beever (Tex. Civ. App.) 198 S. W. 974; Langford v. Bivins (Tex. Civ. App.) 225 S. W. 867.

[3] (3) Whether the correspondence constitutes a contract is a question of law for the court. Patton v. Rucker, supra; Elliott on Contracts, pp. 51 and 52.

[4] (4) If all the terms of an agreement have not been settled, and it is understood that these settled terms are to be determined by a formal contract, there is no binding obligation until the writing or formal contract is executed. J. M. Radford Grocery Co. v. Noyes (Tex. Civ. App.) 293 S. W. 653; Brillhart v. Beever, supra.

[5] (5) There must be no variance between the acceptance and the offer. An acceptance upon terms varying from the offer is a rejection of the offer, and puts an end to the negotiations, unless the party who made the original offer renews it, or assents to the modification suggested. The other party to the rejected offer cannot afterwards revive it by tendering an acceptance of it. The acceptance must likewise be unequivocal and unconditional. If any condition is fixed, there is a rejection of the offer. 6 R. C. L. 608.

By the above principles we are to determine whether the foregoing correspondence created the alleged contract which the plaintiffs Godfrey and Eades seek to enforce against the defendant bank.

The contentions of the litigants have been

carefully considered in the light of splendid briefs and able arguments of counsel representing the respective litigants. Thus aided, certain definite conclusions concerning the merits of this appeal have been reached, and our views on the contentions made may be explicitly conveyed by a brief discussion of the seven reasons advanced by defendant in support of the action of the trial court in directing a verdict in its behalf upon the theory that the minds of the parties never met on the material matters essential to the creation of a contract binding upon each.

[6] The defendant's reasons are:

"First. Hutchison was under no obligation, under his letters, to attach a draft and send same to Dallas for collection, but the money was payable in Abilene. In none of Hutchison's letters, at any time, did he ever say that he would attach the deeds to drafts for collection and send to a Dallas bank."

We do not believe the record supports the proposition made. Originally it might be said that the money was payable in Abilene, and that Hutchison (the bank) at such time was under no obligation to attach the deeds to drafts and send same for collection to the Dallas bank, as held in Langford v. Bivins (Tex. Civ. App.) 225 S. W. 867, but the bank, in Hutchison's letter of July 14th, acceded to the method of procedure, the *"way outlined"* (italics ours), in Godfrey's letter of July 12th. In that letter it is seen that the deeds submitted to Hutchison or the bank were satisfactory, except that he (Hutchison) made one *"little change"* therein and concerning that Hutchison, in the concluding sentence of his letter, says:

"Please pardon me for making this change, as I thought it would be better and hope it will be satisfactory to you, but if not, will be glad to handle in the way outlined."

[7] "Second. In the letters from Hutchison, Hutchison agreed to give a letter guaranteeing the abstract to be a duplicate of the abstract on 41, but he nowhere offered to furnish an abstract showing a merchantable title. Godfrey, in his letter of July 12th, said: 'If you will simply write me * * * a letter guaranteeing to furnish me with complete abstract showing good and marketable title in the Central State Bank, * * * and then attach this letter to the two mineral deeds which I inclose herewith, after you have properly executed and acknowledged said deeds for the bank and attach two drafts, one upon T. C. Eades and the other upon P. S. Godfrey, and send all to the Mercantile National Bank, Dallas, Tex., subject to our examination and approval, we will, as soon as we have examined the papers and found them in proper form, take up the two drafts. * * * You state in your letter that you will furnish one complete abstract covering the three sections which will be exactly the same as the abstract I now hold of section 41. You

are in error in believing that the abstract I now hold covers all six of these sections.' Hutchison was under no obligation under his offer to furnish an abstract."

In arriving at the intention of the plaintiffs and defendant throughout these negotiations, the entire correspondence passing between them must be looked to in arriving at such intention.

In the letter of May 29th, Hutchison, in the course of these negotiations, spoke of furnishing to plaintiffs "one complete abstract covering the three sections," and in his letter of June 4th, with the same subject-matter in mind, stated:

"I will furnish you one complete abstract covering amount of royalty in the three sections which will be exactly the same as the abstract that you now hold on section 41, as this abstract covers the six sections and just certifies to for one section. I will give you a letter guaranteeing the abstract to be a duplicate of the one you have so that you may pay on this amount and which will protect you so that you may recover the amount paid for this royalty in case the abstract is not as represented."

In Godfrey's letter to the Central State Bank of date July 12th, he calls Hutchison's attention to a mere mistake of fact in the following language:

"You state in your letter that you will furnish one complete abstract covering the three sections, which will be exactly the same as the abstract I now hold on section 41. You are in error in believing that the abstract I now hold covers all six of these sections, as quite a number of the documents set out therein, particularly all records from the General Land Office, cover only section 41, and a number of these documents set out therein cover only those sections embodied in block B–5 and do not cover section 46, which is in block No. 26. I shall, of course, expect you to furnish me one complete abstract, showing good and *marketable* title to sections 34 and 35 of block B–5, and section 46 in block No. 26, public school lands, Winkler county, Tex."

In this letter Godfrey inclosed the two mineral deeds which Hutchison evidently had in mind when he wrote the letter of July 14th, in which he signified his willingness to waive *"a little change,"* and carry out the deal *"in the way outlined"* in Godfrey's letter of July 12th, and from which the above extract is taken. So it seems clear to us that Hutchison fully agreed to furnish an abstract showing good and merchantable title, and the fact that Godfrey was willing to accept, for the time being, a letter from the bank guaranteeing to him that in due time a correct abstract (which both parties evidently had in mind) would be furnished him, would not justify the bank in repudiating this transaction, nor support its contention that Godfrey had not unconditionally acceded to the terms of the agreement. However, the Hutchison letter of July 14th acceded to the sug-

gestions of Godfrey in his letter of July 12th, and agreed "to handle in the way outlined" by Godfrey.

[8] "Third. Letters may constitute a contract, but must be so understood, and any preliminary negotiations looking to a contract are not sufficient. In Godfrey's letter to Hutchison, dated June 3d, Godfrey said: 'If you care to sell at this price, confirm by mail, and if you desire, I will then prepare a contract for both parties to sign.'

"In Hutchison's reply, on June 4th, Hutchison said: 'If you prefer to draw the contract or deed, you may do so, and send same to me for my examination, and will accept same if it meets with our terms.'

"In Godfrey's letter to Hutchison, dated July 12th, Godfrey said: 'In order to close this deal I do not think it will be necessary for us to execute any sales contract, but instead I have prepared two mineral deeds. * * *'

"Hutchison, however, was not satisfied with these deeds, and on July 14th, wrote a letter saying: 'I rewrote these deeds making a little change in the last paragraph. * * * In case the changes I have made are not satisfactory to you, please mark or write into it such changes as will be satisfactory, and return to me, and I will try to adjust the matter satisfactorily to both of us.'

"In Godfrey's reply, July 15th, Godfrey said: 'Beg to state that after examining these deeds (the ones Hutchison sent Godfrey), it appears to me that they would not be satisfactory to either yourself or, to me. * * * I have prepared two more deeds. * * * I inclose these two new deeds herewith. * * * After examining the two which I have prepared and inclose herewith if they meet with your approval, you may execute them. * * * Then, if you will furnish me with complete abstract showing good and marketable title to this property in the bank and will attach draft to the deeds and forward to the Mercantile National Bank according to instructions in my former letter, I will see that these drafts are properly taken up.' "

The observation of counsel for defendant is that the letter and statements above referred to as reason No. 3 show conclusively that it was the intention of both parties that the deed should constitute a contract between them, and that there was no trade until such deed was agreed upon. With this view we are not in accord. In Godfrey's letter of July 12th we find no evidence of an intention upon his part to depart in any material respect from the mutual agreement theretofore reached by him and Hutchison as shown in the previous correspondence, especially the Godfrey letter of July 12th and the Hutchison letter of July 14th; and we do not regard it as worthy of serious consideration that in the letter of July 15th God-

frey called Hutchison's attention to what might be regarded as an error or mistake in the recitation of a record fact pertaining to the title. The matters to which the defendant bank called attention merely evidence the effort and purpose of the parties to draw a deed correctly reflecting the terms embraced in the foregoing correspondence. It was the duty of the bank, under the circumstances, to furnish such a deed, and apparently this was the intention of Hutchison, its president.

In Bushmeyer v. McGarry, 112 Ark. 373, 166 S. W. 168, a case strikingly similar in facts to the one under consideration, the Supreme Court used this language:

"In the letter of February 29th plaintiff proposed another slight change in the terms of the contract by asking defendant to forward the draft to Little Rock for collection through a bank there, instead of his sending the draft to Oklahoma City. That, however, was a mere proposal of the plaintiff for this slight change in the details; but, even if it be deemed material, it did not constitute a breach on the plaintiff's part of the contract or justify a breach on the part of defendant. The rights of the parties were fixed by the contract embraced in the former correspondence, and either one of them might ask concessions or changes without giving legal cause to the other to refuse to perform the contract as originally established. 'If an offer is accepted as made, the acceptance is not conditional and does not vary from the offer because of inquiries, whether the offerer will change his terms, or as to future acts, or the expression of a hope, or suggestions,' etc. 9 Cyc. 269. After the contract was entered into the defendant had the right to insist upon a literal compliance with its terms, but the fact that the plaintiff asked a change in some of the details did not justify defendant in breaking the contract.

"The same may be said with reference to the plaintiff's proposal in that letter that defendant accompany the deed by new bill of assurance. On that feature of the case, however, it may be said that plaintiff had the right to make that request of defendant, for the reason that there was an obvious error in the original bill of assurance and it was defendant's duty to correct that error as a part of the performance of his contract by the execution of a new instrument."

This is a sound principle of law and applicable, not only to this particular contention under consideration, but to other phases of the record before us.

[9-11] "Fourth. Before the bank could have been bound, the offer and the acceptance by Eades must have been in writing. Eades nowhere, at no time, confirmed an offer to buy a one-sixteenth. Therefore, the bank was never in a position to enforce performance against Eades. Certainly Eades could not enforce a performance against the bank if the bank could not enforce performance against Eades. Godfrey, by refusing to take the two-sixteenths and by making a new proposition out and out, rejected all prior offers."

As we view the testimony in this case, under the law governing transactions involving the purchase and sale of real estate, we are unable to reach the same conclusion advanced by the defendant in this, its fourth reason. According to the pleadings and the testimony of both Godfrey and Eades, Godfrey throughout the negotiations was acting as the agent for Eades in the purchase of these mineral rights. If, in fact, he were such agent, Godfrey needed no written authority to act in that capacity, for it is elementary that written authority is not necessary to enable an agent to bind his principal in an executory contract for the sale or purchase of lands. Huffman v. Cartwright, 44 Tex. 296; Dyer v. Winston, 33 Tex. Civ. App. 412, 77 S. W. 227; Fisher v. Bowser, 41 Tex. 223. In such cases the principal is bound by the act of the agent, and the liability of a principal on a written contract by the agent may be proved by parol. 2 Wilson, § 276.

It is not necessary, in order to bind the principal, that the memorandum should be executed in his name, and the requirement of the statute of frauds is satisfied, if the memorandum is signed by the agent. The name of the principal may be disclosed by parol testimony. Tynan v. Dullnig (Tex. Civ. App.) 25 S. W. 465; Donnell v. Currie & Dohoney, 62 Tex. Civ. App. 134, 131 S. W. 89; Marlin v. Kosmyroski et al. (Tex. Civ. App.) 27 S. W. 1042.

Therefore, if it be conceded that Godfrey was the agent of Eades, we conclude that Eades was bound by the terms of the agreement evidenced by the correspondence passed between the bank or Hutchison and Godfrey. If Godfrey was such agent, no further or other confirmation by Eades of any offer made by Godfrey in his (Eades') behalf was necessary. At the conclusion of the negotiations, the bank on the one hand and Godfrey and Eades on the other sustained the same legal relations towards each other, as did Rucker to Patton and Jones in the leading authority of Patton et al. v. Rucker, 29 Tex. 402.

[12] "Fifth. It is a settled proposition of law that in an action for specific performance where no money has been paid and no consideration moved, except a promise for a promise, that the obligations must be mutual, and, unless the obligations are mutual, there can be no performance by either party."

Our view is the correspondence evidences mutuality, and what has been said in the discussion of "reason 4" is pertinent here.

[13] "Sixth. In an action for specific performance where no consideration is paid the party seeking to enforce a contract cannot arbitrarily change the subject-matter, and then demand a performance. Here Godfrey had negotiated a purchase of two-sixteenths and paid therefor $650, and in a letter of July 12th he says he will take one-sixteenth and pay therefor $325. Godfrey's refusal in his letter of the 12th to take two-sixteenths terminated the negotiations, and his offer to take one-sixteenth was a new offer entirely.

"Hutchison had made no offer to sell to Eades and had made no acceptance of Godfrey's suggestion that Eades take a one sixteenth."

Certainly the bank was under no obligation to resurrect the original deal as suggested in Godfrey's letter of July 12th, but it elected to do so in its letter of July 14th. This contention of defendant is sufficiently answered by referrence to that communication, which evidences no unwillingness on the part of the bank to split the two-sixteenths equally between plaintiffs and proceed with the consummation of the deal "in the way outlined" in Godfrey's letter of July 12th. In Hutchison's letter, the bank specifically agreed to so carry out the deal.

[14] "Seventh. Up to July 12th both Mr. Hutchison and Mr. Godfrey had used the term 'royalty' and nothing had been said about 'mineral rights.' Mr. Hutchison's letter of June 4th was answered by Godfrey on July 12th. In that letter Godfrey changed the whole deal:

"(a) He prepared and sent to Mr. Hutchison, and asked him to have executed, mineral deeds, whereas prior to that time all negotiations had referred to the royalty. In the deeds which Godfrey prepared he asked for a conveyance not of the royalty, but of the mineral rights.

"(b) Up to the 12th of July the negotiations had all been with Godfrey, nothing had been said about any other person, and in Godfrey's letter of July 12th he said:

" 'I owe you an apology for not answering your letter of the 4th of June in regard to the sale of the two-sixteenths of the owner's one-eighth in 34, 35, and 46. * * * I have a friend here who is taking one-half of this, that is, I am to take a one-sixteenth of the landowner's one-eighth and he is taking one-sixteenth of the landowner's one-eighth.' In Godfrey's prior negotiations he had offered to purchase two-sixteenths, and his friend Eades had never been mentioned. Hutchison was under no obligation to negotiate with Eades, and he was certainly under no obligation to sell to Godfrey one-half of what had been considered in the prior negotiations, that is to say, in the prior negotiations, two-sixteenths had been considered, whereas, in the letter of July 12th Godfrey reduces it to one-sixteenth in so far as he was concerned. Hutchison, in his reply to Godfrey, did not accept the new offer which Godfrey made in his letter of July 12th."

A complete answer to the defendant's proposition advanced in its seventh reason is to be found in Hutchison's letter of July 14th, the concluding sentence of which is:

"Please pardon me for making this change, as I thought it would be better and hope it will be, satisfactory to you, but if not, will be glad to handle in the way outlined."

The correspondence between the bank and Godfrey, as well as the course of negotiations between these parties in the sale of section 41 referred to, evidences to our minds that, in the use of the terms "royalty" and "mineral rights," each of the parties had in mind the same subject-matter, to wit, the sale of mineral rights, as evidenced by the deeds rewritten by Hutchison, as indicated in his letter of July 14th. It is believed that Hutchison, Godfrey, and Eades each had in mind the identical interest called for in the rewritten deed and demanded in the plaintiffs' petition. Just such character of instrument was executed in the sale to Godfrey of the interest purchased by him in section 41. Hutchison's letter of May 18th throws light upon this phase of the transaction. In his letter of that date, replying to Godfrey's overtures to purchase an oil and gas lease on section 38, he stated:

"I sold the three sections we have been mentioning, namely, 23, 24, and 38 in fee. * * * However, I still have plenty of royalty in the other six sections which are nearer the well, same being sections 34, 35, 40, 41, 45, and 46, that I could sell, which in many instances is better to buy than lease, from the fact that it does not run out as a lease does."

[15] The defendant contends further in support of the court's action in withdrawing the case from the jury that the record in this case does not show that Hutchison, president of the bank, had any authority whatever from the bank, through its duly constituted board of directors, to enter into an executory contract for the conveyance of the bank's real estate; that, the rule being established in Texas that a president of a bank has no such authority, it becomes a question as to the burden of proof; that, while an executed contract, signed and acknowledged · by the president, and attested by the cashier, and under seal of the bank, duly delivered, makes a prima facie case, yet an executory contract by the president alone does not raise such a presumption. As an abstract proposition of law, this is correct, but, as we read this record, the correspondence is charged to constitute a contract entered into by the bank, and the authority of President Hutchison to negotiate the transaction and bind the bank by such contract is not, in fact, an issue before this court, because there was no proper pleadings to support such an issue. If it was designed to interpose a plea of non est factum under article 2010, R. S. (1925), the appellee failed to do so in failing to verify said plea.

In the case of Thomason v. Berry (Tex. Com. App.) 276 S. W. 185, is found this language:

"In Drew v. Harrison, 12 Tex. 279, it is clearly held that a plea of non est factum not verified under the statute is a nullity, and it is not necessary to except to it."

And further in that opinion it is stated:

"This necessity for a verified plea of non est factum extends not only to those cases involving instruments which purport to be executed by the defendant, but also to those cases of instruments which do not purport to be executed by defendant where the plaintiff has alleged that such writing was the instrument of the defendant. Bradford v. Taylor, 61 Tex. 508; San Antonio, etc., R. v. Harrison, 72 Tex. 478, 10 S. W. 556; I. & G. N. R. Co. v. Tisdale, 74 Tex. 8, 11 S. W. 900, 4 L. R. A. 545."

It may be further observed that in the case of Hunt v. Siemers, 22 Tex. Civ. App. 94, 53 S. W. 387 (writ of error denied), it is held that, when a pleading charges the written instrument on which it is founded to have been executed by an agent of the parties against whom the instrument is invoked, the issue of the alleged agent's authority to execute the instrument cannot be raised except by verified denial. In the case before us, neither the execution of the instrument nor the authority of the agent, Hutchison, to represent said bank in such negotiations, is denied under oath. That being true, no proof was necessary, San Antonio R. Co. v. Harrison, 72 Tex. 478, 10 S. W. 556, and, in so far as the contention before us is concerned, we are compelled to dispose of it upon the proposition that no issue as to the authority of Hutchison to act for and bind the bank was presented.

[16, 17] As stated by Chief Justice Coke of our Supreme Court in Patton v. Rucker, 29 Tex. 402:

"So a correspondence consisting of a number of letters between the parties may be taken together, and construed and considered with reference to each other, and the substantial meaning of the whole arrived at; and if, when thus blended, as it were, into one, and the result is ascertained, it is clear that the parties understood each other, and that the terms proposed by one were acceded to by the other, it is a valid and binding contract, and may be enforced. If the substantial terms are sufficiently expressed, collateral circumstances, not contradicting but consistent with them, may be supplied, as virtually comprehended in the agreement expressed."

We have weighed and considered with care the correspondence set out in this opinion and which forms the basis of this lawsuit, and have concluded that, in so far as the correspondence is concerned, it squares with all the requirements prescribed by our Supreme Court in the above quotation, as well as in that opinion, and that it constitutes a concluded agreement binding as between the parties. Plaintiffs contend that, upon this view or conclusion, the judgment of the trial court should be reversed and a judgment here ren-

5 S.W.(2d)—34½

dered in their behalf, but this we are unable to do, for the reason that, when the trial court withdrew the case from the jury, there were before him two main issues, one of which was the construction to be placed upon the correspondence, and the second, the issue as to whether or not in the negotiating of this deal Godfrey was, in fact, acting as an agent for Eades. Evidently the trial court construed the correspondence contrary to the conclusions we have reached, and presumably found against the plaintiffs upon their contention that Godfrey was such agent of Eades. In this situation, under the defendant's general denial, there was an issue as to such agency, which was either overlooked or resolved by the trial court against the plaintiffs. The testimony in support of such agency resting in parol and coming wholly from the interested parties, Godfrey and Eades, that issue should have been submitted for determination to the jury, who could believe or disbelieve the testimony of the plaintiffs in the exercise of its prerogative in judging the credibility of the witnesses and the weight to be given the testimony. Pope v. Beauchamp, 110 Tex. 271, 219 S. W. 447.

Under the state of this record we think it was error for the trial court to withdraw the case from the jury. The assignments addressed to that action of the court are sustained. For the reasons assigned, the judgment of the trial court is reversed, and the cause remanded.

### On Rehearing.

FUNDERBURK, J. It is the opinion of a majority of the court that the motion of the appellee for a rehearing should be overruled. The writer, by his study of the case, reaches a different conclusion, and is of the opinion that the motion should be granted, the former judgment set aside, and judgment be rendered affirming the judgment of the trial court.

It was the contention of appellant upon the original submission of the case that Godfrey's letter of June 3, 1926, and the bank's reply of June 4, 1926, constitutes a contract of the purchase and sale of two-sixteenths of one-eighth royalty in the three sections of land, and that the subsequent correspondence are but matters of detail incident to a final closing of the deal. The argument is persuasive, and I am convinced that, if in all the correspondence a contract is to be found, it in fact consists of these two letters. In the letter of June 3d, Godfrey proposes to pay $650 for two-sixteenths of the royalty in the three sections, and that much of the offer is clearly and unqualifiedly accepted in the bank's letter of June 4th. The offer or proposition, however, was a little broader than merely naming the consideration and the subject-matter of the negotiations. A part of Godfrey's proposition besides that mentioned is as follows:

"And you to furnish one abstract showing good and marketable title covering the three sections."

In a sale of real estate, there is no implied obligation to furnish an abstract at all. Langford v. Bivins (Tex. Civ. App.) 225 S. W. 867, and authorities cited. There is, of course, then no implied obligation to furnish an abstract of any particular characteristics, as, for instance, one showing good and marketable title. If this part of Godfrey's offer was accepted unconditionally and without qualification, I am of the opinion that there was a meeting of the minds and resultant contract. If accepted, such acceptance is to be found in that part of the reply, which reads:

"I will furnish you one complete abstract covering amount of royalty in the three sections, which will be exactly the same as the abstract that you now hold on section 41, as that abstract covers the six sections and just certifies to for one section. I will give you a letter guaranteeing the abstract to be a duplicate of the one you have, so that you may pay on this amount, and which will protect you, so that you may recover the amount paid for this royalty in case the abstract is not as represented."

Stated in other words, the question is whether or not an offer that is conditioned upon being furnished a complete abstract showing good and marketable title is accepted by an agreement to furnish an abstract, which is an exact duplicate of an abstract at the time in possession of the offerer, and in lieu of immediate delivery of such abstract a letter to be given guaranteeing that such abstract will be furnished.

Appellant's proposition as to being furnished an abstract was not accepted, unless it can be said that an agreement to furnish one complete abstract "exactly the same as the abstract" Godfrey "had on section 41" is exactly equivalent to an agreement to furnish "a complete abstract showing good and marketable title." Whether this be so or not is not disclosed by either of the two letters. The letters and the circumstances, however, strongly suggest that such is not the fact. The question would arise why Godfrey was insisting upon "a complete abstract showing good and marketable title" to the three sections which he proposed to purchase, if he already had such an abstract. But, conceding that it is possible that he would want another abstract of the character mentioned, certainly other evidence than the two letters must be looked to to determine if the agreement of the bank constituted an acceptance of the offer with respect to the furnishing of an abstract with the required characteristics. Conceding, provisionally, that it is not necessary that the identity of the offer and acceptance be shown by the letters themselves, and looking to other available evidence, we find that in Godfrey's letter of July 12th that his

former offer to be furnished an "abstract showing good and marketable title" was not accepted by the agreement to furnish an abstract "exactly the same" as the one on section 41, because, as to the abstract then owned by Godfrey and covering section 41, there were, according to this letter, "quite a number of the documents set out therein, particularly all records from the General Land Office, cover only section 41, and a number of these documents set out therein cover only those sections embodied in block B–5, and do not cover section 46, which is in block 26." From this it is apparent that, if Godfrey was furnished an abstract, an exact duplicate of the abstract he had on section 41, it would not be a complete abstract of the sections he was purchasing, to say nothing of whether or not it showed good and marketable title. Without going outside the correspondence alleged to constitute the contract, it is apparent, then, that the letters of June 3d and June 4th do not of themselves constitute a contract, because the bank did not therein agree to furnish an abstract showing good and marketable title to the interest proposed to be purchased in the three sections of land. Under the well-settled rule, what was said relative to furnishing an abstract in the bank's letter of June 4th must be construed as a rejection of appellant's offer, and constitutes a new offer to substitute something else for the obligation to furnish an abstract showing good and marketable title. Godfrey did not propose to pay $650 for two-sixteenths royalty except as a part only of a proposition that included the furnishing to him of a complete abstract showing good and marketable title. A failure to accept a part of the proposition was, so far as the making of a contract is concerned, the rejection of all. This view disposes of all of the propositions urged in the original brief of appellants.

It may be observed, however, that, even if the two letters of June 3d and June 4th did constitute a contract, specific performance thereof could not be enforced under the pleadings in this case. It is axiomatic that, in a suit upon a contract, the identical contract alleged must be proved. Padgitt Bros. Co. v. Dorsey (Tex. Civ. App.) 194 S. W. 1124; Gammage v. Alexander, 14 Tex. 418; Bagley v. Brack (Tex. Civ. App.) 154 S. W. 247; Western Union Telephone Co. v. Smith, 88 Tex. 9, 28 S. W. 931, 30 S. W. 549. A provision of the contract alleged is that the bank "did agree therein (that is, in said contract) to execute and deliver to each of these plaintiffs a good and sufficient mineral deed to said interests." If the contract is to be found in the two letters mentioned, then certainly the evidence does not prove a contract containing any such provision as that last quoted. A peremptory instruction would have been required just the same.

It becomes necessary, then, to consider if a contract of the nature or identity alleged in the pleadings can be found in the subsequent correspondence considered alone or in connection with the two letters already discussed, or any other of the correspondence claimed to show a contract. In the determination of this question, no consideration, I think, can be given to the two mineral deeds which the evidence shows were signed and acknowledged, but never delivered. This, because the contract alleged did not include such deeds as a part thereof. According to the pleadings, the contract consists of certain correspondence attached as exhibits, and which do not include the deeds. Besides this, it is alleged "that, thereafter, in pursuance of said contract, etc., the deeds were signed, etc., but not delivered," thus clearly showing that the deeds themselves were not claimed to be a part of the contract.

Godfrey's letter of July 12, 1926, written more than a month after the bank's letter of June 4th, is not an acceptance of the offer of the bank to furnish an abstract exactly like the one Godfrey had on section 41. He calls attention to the fact that such an abstract would not correctly reflect the condition of the title to the three sections constituting the subject-matter of the negotiations. Neither is it a waiver of that part of Godfrey's former proposal that he be furnished an "abstract showing good and marketable title" to the royalty in the three sections of land. This is manifest from the fact that in this letter the demand is repeated for the same character of abstract. This letter, then, must be considered as a rejection on the part of Godfrey of the bank's proposal contained in its letter of June 4th. Godfrey's letter of July 12th, then, must be regarded as a new offer to enter into a contract with the bank respecting the sale and purchase of the royalty in question. It seems to me that as a new offer it supersedes all previous negotiations. Whether this be exactly correct or not is not material. It certainly makes mention of everything discussed in previous negotiations, and on its face appears to contain a full statement of the terms and conditions of the contract appellant is "still willing" to make. In this he offers: (1) That Godfrey will purchase one-sixteenth of the one-eighth royalty for $325; (2) that Eades will purchase one-sixteenth of the one-eighth royalty for $325; (3) that one complete abstract showing good and marketable title in all the sections shall be furnished; or (4) that, in lieu of immediately furnishing such abstract, a letter may be written guaranteeing that the bank will furnish a complete abstract showing good and marketable title; (5) that two mineral deeds (prepared by Godfrey and inclosed in the letter) shall be properly executed and acknowledged and with two drafts attached, each for $325, one upon T. C. Eades and the other upon P. S. Godfrey, shall be sent to the Mercantile National Bank, Dallas, Tex., subject to examination and approval; (6) that both Godfrey and Eades, as

soon as they have examined the papers and found them in proper form, will take up the two drafts; (7) it is proposed that a formal contract be dispensed with, and that, in lieu thereof, that the deeds prepared and inclosed be executed and returned in the manner described.

To make a contract binding on the bank of this offer of Godfrey in his letter of July 12th, it was necessary: (1) To wire or write Godfrey that the offer was accepted; or (2) (a) execute the deeds as same were prepared by Godfrey; (b) attach the drafts for $325 each to the deeds as directed; (c) attach to the deeds and drafts a letter stating that the bank guaranteed to furnish a complete abstract showing good and marketable title to the property; (d) forward all to the Dallas bank.

With these requisites in mind, let us examine the contents of the bank's reply dated July 14, 1926. It certainly is not an unconditional acceptance. Up to that time the deeds have not been executed. The letter does not say that the offer is accepted. Is it to be construed as a rejection of Godfrey's offer and the making of a new proposition? It evidences a rejection of the deeds written by Godfrey; for new deeds are proposed with "a little change in the last paragraph." The offer to be "furnished an abstract showing a good and marketable title," or, in lieu thereof, a letter guaranteeing that such an abstract would be furnished, is likewise rejected, and there is substituted the offer to send an abstract to be examined, and the deal to be closed only upon the contingency that Godfrey finds the abstract satisfactory. An obligation to furnish an abstract showing good and marketable title, or an obligation to guarantee that such an abstract will be furnished, is a very different thing from an obligation to furnish an abstract for one to examine and determine, if it is satisfactory. An abstract may be satisfactory which does not show good title. This statement is made with some authorities in mind that may be thought to hold to the contrary. Moot v. Business Men's, etc., Ass'n, 157 N. Y. 201, 52 N. E. 1, 45 L. R. A. 666; Latrobe v. Winans, 89 Md. 636, 43 A. 829. It must be remembered that it is not the character of title that the parties are negotiating, but the character of abstract. Even if the rule in Pennington v. Howland, 21 R. I. 65, 41 A. 891, 79 Am. St. Rep. 774, is not exactly applicable, the principle discussed in Maupin on "Title," infra, is sufficient to show a distinction between an abstract showing a good marketable title, and one that upon examination by an individual is found satisfactory. One individual will sometimes approve an abstract which another will disapprove. Maupin on "Marketable Title," p. 770. Individual opinion may differ as to when an abstract shows good and marketable title. From this it results that an abstract may show good and marketable title, and still be rejected under a contract that it must be satisfactory. I therefore conclude that the bank's letter of July 14th must be construed as a rejection of Godfrey's offer of July 12th, and that that letter must be regarded as a new offer.

As a new offer, the letter may be analyzed as proposing: (1) That Godfrey approve or disapprove the two deeds as rewritten with the "little change in the last paragraph"; (2) that, if approved, same will be indorsed (executed we take it), and sent to appellant with all necessary papers, including abstract; (3) the abstract to be examined and closing of the deal conditioned upon same being satisfactory; (4) in the alternative, if changes in deeds not satisfactory, then Godfrey to make or write in such changes as will be satisfactory and return same; (5) in event of such return, promise is made to try to adjust the matter satisfactorily.

This letter proposes terms upon which said contract may be consummated, and also proposes, in case it cannot be so consummated, a basis for future negotiations. To have made a contract of this offer, it was necessary for Godfrey to have assented to the deeds as changed, and, further, to have accepted, in lieu of his proposal that he be furnished a complete "abstract showing good and marketable title," or a letter guaranteeing that such abstract would be furnished, the agreement or proposal of the bank to furnish an abstract to be examined, and the closing of the deal to be contingent upon such abstract being found by Godfrey to be satisfactory. Looking now to Godfrey's reply of July 15th, we see that the changed deeds were not satisfactory, for the letter expressly says so. I do not think it is important that the change may not have varied the legal effect of the deeds. It must be borne in mind there was no duty or obligation to approve the form of the deeds. Godfrey had the right to be capricious or arbitrary. 13 C. J. 297. The important thing was whether or not he approved, and not the validity of any reasons why he disapproved. As to this matter, then, I think there was clearly no acceptance, and therefore no contract, but it is also clear that Godfrey did not consent to accept the proposal of the bank with reference to furnishing an abstract in lieu of Godfrey's offer to be furnished a complete abstract showing good and marketable title, for this demand is again repeated without change. Therefore Godfrey's letter of July 15th must be considered as a rejection of the bank's offer in its letter of July 14th, and must be regarded as a new offer to be accepted or rejected by the bank.

As before, we analyze this offer for the purpose of more certainly determining if there was an unqualified acceptance of the entire proposal. The proposition is: (1) That the bank execute the new deeds (the sec-

ond deeds proposed by Godfrey); (2) that the bank furnish complete abstract showing good and marketable title; (3) that it attach drafts to the deeds (as previously directed); (4) that deeds and drafts attached be forwarded to the Dallas bank (as previously directed).

To constitute a contract enforceable against the bank, it was necessary for the bank:

(1) To write or wire agreement to execute the deeds, attach drafts, and send to the Dallas bank, together with a complete abstract showing good and marketable title. It is doubtful if attaching a letter guaranteeing to furnish an abstract showing good and marketable title would have been sufficient, since this alternative was not contained in the last offer, but, for the purpose of testing the matter, we will assume that, in lieu of sending the abstract of the kind mentioned, the requirement would have been met by attaching a letter guaranteeing that such abstract would be furnished. Or—

(2) For the bank to have actually executed the deeds, attached same to the drafts and have forwarded them to the Dallas bank, together with a complete abstract showing good and marketable title, or to have in lieu thereof attached a letter guaranteeing to furnish an abstract showing good and marketable title. But the bank did not write, wire, or otherwise notify Godfrey that it would execute and forward the deeds (that is, the particular deeds last prepared by Godfrey) with the drafts and abstract or letter, nor did it in fact do so. Therefore neither of the two things necessary to be done to create a contract was in fact done. There was, therefore, it seems to me, never during the entire negotiations a proposal made by one party, all of the provisions of which were unqualifiedly accepted by the other. There was never a proposal made by Godfrey that did not include an obligation on the part of the bank to furnish a complete abstract showing good and marketable title or a guaranty that such an abstract would be furnished. There was never a letter written by the bank that ex-

pressly or impliedly agreed to furnish a complete abstract showing good and marketable title or to write a letter guaranteeing that such an abstract would be furnished.

Near the close of the bank's letter of July 14th is the following:

"Please pardon me for making this change (i. e., in the deeds), as I thought it would be better, and hope it will be satisfactory to you, *but if not will be glad to handle in the way outlined.*"

The change not being satisfactory as shown by the reply inclosing new deeds, the majority opinion construes the clause underscored as an acceptance of Godfrey's proposition in his letter of July 12th. But Godfrey's letter of the 12th does not suggest any procedure to be followed in case the deeds are not in acceptable form. Indeed, when that letter was written, no such contingency could have been in mind. That letter is a proposition, and not properly referred to as a "way outlined." There is a "way outlined," however—to be followed in the very contingency mentioned. The preceding sentence in the same letter says, in case the change in the deeds is not satisfactory, "please mark or write into it such changes as will be satisfactory and return to me and I will try to adjust the matter satisfactorily to both of us." This is a clear statement of the procedure suggested in case the deeds are not in satisfactory form. Then the writer in a way apologizes, expressing the hope that the changes made will meet with approval, and then says: "But if not will be glad to handle in the way outlined." It seems to me that the "way outlined" could not possibly mean anything else than for Godfrey to again write the deeds to suit himself, return to the bank, and an effort would then be made to iron out the differences.

I am therefore of the opinion that the action of the trial court in peremptorily instructing a verdict for the defendant was correct, that the motion for rehearing should be sustained, and the judgment of the trial court affirmed.